FILED

2016 Mar-28  PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **ROCCO J. LEO, in his Capacity as Trustee for the Bankruptcy Estate of Ashley Murphree,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) **Case No.: 1:13-CV-1826-VEH** ) |
| **ALFA MUTUAL INSURANCE COMPANY, et al.,** | ) ) ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION AND ORDER

This case was originally filed on October 2, 2013, by the plaintiff, Rocco J. Leo (hereinafter referred to as "the plaintiff" or "Leo"), the Trustee for the Bankruptcy Estate of Ashley Murphree (hereinafter referred to as "Ashley" or "Murphree"). (Doc. 1). At the time Leo filed the case, Murphree was alive. She has since died. The Second Amended Complaint (doc. 96) was filed on June 26, 2015, and names as defendants Alfa Mutual Insurance Company ("Alfa"), Rebecca A. Walker ("Walker"), and Stephanie Wagner ("Wagner"). Alfa is Murphree's former automobile liability insurance carrier, and Walker and Wagner are her former attorneys.

Leo's complaint first seeks to void, as a fraudulent transfer under the bankruptcy code, a document in which Murphree promised not to sue these defendants. (Count

One). Against Alfa, Leo alleges "Negligent/Wanton Failure to Investigate and Settle" (Count Two), "Bad Faith Failure to Investigate and Settle" (Count Three), "Suppression" (Count Four), and "Conspiracy" (Count Five). Against Walker and Wagner, Leo alleges a claim under Ala. Code § 6-5-570, *et seq.*, for "Legal Service Liability" (Counts Six and Seven). All counts pertain to an underlying lawsuit (the "Underlying Action") filed against Murphree by Willow Jo Cameron ("Cameron"). Leo's claims arise out of the defendants' handling of the Underlying Action, and, after an excess verdict was returned against Murphree in that case, the defendants obtaining her signature on a Covenant Not To Sue them in retrun for Alfa's agreement to pay for an attorney to prepare bankruptcy papers for Murphree, who wanted to file for bankruptcy because of that excess judgment.

On January 27, 2016, this court granted Wagner's uncontested motion for summary judgment, and dismissed Count Seven, and Wagner, from this case. (Doc. 138). Accordingly, as to pleadings filed jointly by Walker and Wagner before Wagner was dismissed, the court will simply refer to them as filed by Walker. Further, the court will from time to time collectively refer hereinafter to Alfa and Walker as "the defendants."

The case now comes before the court on the motions for summary judgment filed by the sole remaining defendants, Alfa (doc. 103) and Walker (doc. 105). Also before the court are the motions to strike filed by Walker (doc. 125) and Alfa (docs. 128, 129, 131). All motions have been responded to and are under submission. For the reasons

2

stated herein, document 129 will be **DENIED**. The remaining motions to strike will each be **GRANTED in part** and **DENIED in part** as noted. Finally, the motions for summary judgment will each be **GRANTED in part** and **DENIED in part** as noted.

I.   **THE DEFENDANTS' MOTIONS TO STRIKE PORTIONS OF THE AFFIDAVIT OF MICHELLE BURGESS (DOCS. 125, 131)**[1]

   A.   <u>Standard</u>

   It has long been the law in this circuit that, when deciding a motion for summary judgment, a district court may not consider evidence which could not be reduced to an admissible form at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). But, until 2010, Rule 56 lacked a formal procedure to challenge such inadmissible evidence. In 2010, the advisory committee added Rule 56(c)(2), which provides:

> A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

FED. R. CIV. P. 56(c)(2). Although the parties have styled their motions as motions to strike, the motions are, in substance, a challenge to the admissibility of evidence. Therefore, the court will treat the motions as objections under Rule 56(c)(2).

   The advisory committee's note to Rule 56(c)(2) provides that:

> [An] objection [under Rule 56(c)(2)] functions much as an objection at trial

---

[1] The majority of the argument on this issue appears in Walker's motion to strike. (Doc. 125). Alfa's motion incorporates Walker's motion, and includes one paragraph of additional argument. (Doc. 131). The plaintiff's response to the motions appears in one document. (Doc. 132). Walker filed a reply brief. (Doc. 136). Alfa did not file a reply brief.

> *. . . . The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.*

Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments (emphasis added).

### B.   Analysis

As the court has noted, Ashley Murphree died after this lawsuit was filed. Michelle Burgess ("Burgess") is Murphree's mother.   In the absence of direct evidence from Murphree herself, Leo is relying on Burgess's declaration, at summary judgment, solely to establish Murphree's mental anguish damages.   (*See* doc. 122 at 37-39; doc. 123 at 27-29).   Accordingly, the court's analysis focuses on Burgess's statements offered for that limited purpose.

The defendants attack only portions of paragraphs 5, 7, 8, 9, and 10 of Burgess's declaration, as more specifically set out below.   The court will examine each paragraph attacked, in turn, in light of the specific objections thereto.

### 1.   *Paragraph 5*

The defendants argue that the following portions of paragraph 5 are inadmissible hearsay, subject to no exceptions:

> – "It was evident to me, based upon . . . the communications I was able to have with her around that period of time, that Ashley was very much agitated and stressed by the entire process, especially since it was happening during the same time she was dealing with other difficult issues."

> – "This was evident to me based upon Ashley's statement[.]"

4

– "By way of example[,] Ashley . . . expressed stress about the issue of whether she would have to be brought before the judge and jury in clothing she was issued in the SAP program."[2]

(Doc. 122-4 at 3-4).

Rule 801(c) of the Federal Rules of Evidence provides that the term "hearsay" means a statement that: "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). Although the plaintiff does not expressly argue that these statements are not hearsay, he does dispute it implicitly by stating that "any hearsay that may be contained in paragraph 5 falls within the state-of-mind exception [to the rule against hearsay]." (Doc. 132 at 4).[3]

Rule 803(3) of the Federal Rules of Evidence provides:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . .

(3) Then-Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

---

[2] As will be dismissed later in this opinion, Murphree was arrested during the pendency of the Underlying Action.

[3] Accordingly, the court will not address the issue of whether the statements qualify as "not hearsay," under FED. R. EVID. 801(d).

FED. R. EVID. 803(3).   The plaintiff states that "[i]f Murphree's nonverbal and verbal conduct is considered hearsay,[4] then it clearly falls within the state-of-mind exception of Rule 803 because it goes to her then-existing mental condition." (Doc. 132 at 4).

The Eleventh Circuit has specifically held that the types of statements offered by Burgess in her affidavit cannot come in under Rule 803(3).  The court has stated:

> "[T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind." Consistent with that position, we have explained that the purpose of the exclusion from Rule 803(3) admissibility is "to narrowly limit those admissible statements to declarations of condition-'I'm scared'-and not belief-'I'm scared because [someone] threatened me.'"

*United States v. Samaniego*, 345 F.3d 1280, 1282 (11th Cir. 2003) (*quoting United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir.1980)) (footnotes omitted). Accordingly, the statement in paragraph 5 that Murphree was "agitated and stressed" falls within the exception, but not the portion of that sentence which states: "by the entire process."   This portion of this sentence will be stricken.   Similarly, the statement that Murphree was "stress[ed]" falls within the exception, but not that the stress was "about the issue of whether she would have to be brought before the judge and jury in clothing she was issued in the SAP program."[5]   This latter portion of this sentence will be

---

[4]  Again, this conclusory statement is not an <u>argument</u> that the statements are "not hearsay."

[5]  As to this statement, the plaintiff, in a conclusory fashion, argues that "[t]he mere utterance by Murphree of the statement indicates her state of mind circumstantially, regardless of

stricken.

The statement "[t]his was evident to me based upon Ashley's statement," is on a different footing. It does not state "why" Murphree was agitated or stressed. Instead, it lays a foundation for how Burgess would have personal knowledge of Murphree's agitation or stress. It will not be stricken.

The defendants next assert that, despite surviving the hearsay challenge. Burgess's remaining statement that Murphree was "agitated" and "stressed," and similar such statements, should also be struck under Rule 602 of the Federal Rules of Evidence, which provides: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." FED. R. EVID. 602. In this case, Burgess's declaration establishes that Burgess had personal knowledge of Murphree's emotional state. The statements in paragraph 5 that Murphree was "agitated" and "stressed" are limited in time by another statement in that same paragraph that Murphree "was dealing with a very emotionally difficult time in her life during much of the *Cameron* matter. Especially leading up to and including the trial of the case." (Doc. 122-4 at 3). Burgess states that she was very familiar with

_____

the truth of the statement. In this regard, the statement is not hearsay." (Doc. 132 at 5). In this case, the "truth of the matter" being asserted is the <u>explanation</u> for <u>why</u> she was upset. The statement is offered to show that Murphree was upset that "she would have to be brought before the judge and jury in clothing she was issued in the SAP program."

Murphree's personality, mood, and attitude, and that her observations are based on: 1) being in Murphree's presence "during trial and the communications I was able to have with her around that period of time"  (doc. 122-4 at 3); and 2) observation of "her expressions, appearance, tone of voice, and mannerisms (doc. 122-4 at 4).

The defendants assert that the "array of challenges facing Ashley Murphree during this period of her life . . . might . . . result in anxiety, agitation, stress, disappointment, and other emotions."  (Doc. 125 at 12).   They contend that any conclusion Burgess makes that her anxiety and stress were caused by the defendants is not supported. Importantly, paragraph 5 contains no such conclusions.[6]   Further, the defendants' argument is the stuff of cross examination.[7]

### 2.   *Paragraph 7*

Paragraph 7 reads:

7.   After the bankruptcy, Ashley expressed worry with regard to the fact that she now would have ruined credit for a number of years.  She told me that a very important part of her future would be the ability to get her own place to live and she was disappointed the bankruptcy made this so difficult.

(Doc. 122-4 at 4).   As with paragraph 5, the defendants argue that Burgess's statement

---

[6]  Assuming, however, that <u>any</u> of Burgess's statements, anywhere in the declaration, regarding the <u>reasons</u> Murphree was upset, were not based upon what Murphree told her, but were Burgess's own statement or opinion as to the reasons, they will be stricken as without foundation.

[7]  In addressing the motion for summary judgment however, this court finds that, once the stricken portions of the declaration are removed, the remaining statements regarding the mental/emotional state of Murphree fail to prove that she experienced mental anguish as a result of any conduct of the defendants.  *See infra* at section IV.C.5.

of the reasons Murphree expressed worry is hearsay, subject to no exceptions.   The

plaintiff argues that this statement is not hearsay, because it is offered only to show

Murphree's mental stress, not that she actually "would have ruined credit, that she wanted

her own place to live, or that the bankruptcy prevented her from obtaining her own place."

(Doc. 132 at 5).   This argument misses the point.   Burgess offers the statement that

"Ashley expressed worry," in order to prove that Murphree was worried–the truth of the

matter asserted.   The remaining portion of paragraph 7 is an effort to explain <u>why</u> she was

worried.   Everything in paragraph 7, except the statement that "Ashley expressed worry,"

will be stricken for the reasons stated in the preceding section.

### 3.    *Paragraph 8*

Paragraph 8 reads:

> 8.    As she was working towards her recovery she also told me it would
> be important to her to have a good vehicle in order to get to work and care
> for her daughter, Ollie.   Again, she expressed to me great concern that this
> would be impossible, even with stable employment because of the
> bankruptcy.

(Doc. 122-4 at 4).   The defendants argue that Burgess's statement of the reasons

Murphree expressed "great concern" is hearsay, subject to no exceptions.   For the same

reasons set out previously, everything in paragraph 8, except the statement that Murphree

"expressed to me great concern," will be stricken.

9

### 4.   *Paragraphs 9*

Paragraph 9 reads:

> 9.     . . . Again, being familiar with Ashley's expressions, appearance, tone of voice and mannerisms, I was able to tell that her diminished future prospects resulting from her bankruptcy disappointed her and dampened what should have been a more positive outlook for her recovery and future.

(Doc. 122-4 at 5).    The defendants argue that Burgess's statement of the reasons Murphree was "disappointed" and "dampened" is hearsay, subject to no exceptions.   For the same reasons set out previously, everything in paragraphs 9, except the statements that Murphree was "disappointed" and "dampened" will be stricken.

### 5.   *Paragraph 10*

Paragraph 10 reads:

> 10.    . . . I do not believe Ashley appreciated or was capable of appreciating the full consequences of declaring bankruptcy on her future. It is my belief that if Ashley had known and appreciated the full risk and potential consequences of going to trial, along with the fact that she had absolutely nothing to lose and would suffer no negative consequence[] by Alfa settling, that Ashley would have requested that Alfa do so.

(Doc. 122-4 at 5). Paragraph 10 is pure speculation.  It will be stricken in its entirety.

## II.   ALFA'S MOTION TO STRIKE TESTIMONY OF IVEY GILMORE (DOC. 128)

Alfa moves this court to strike "the affidavit and deposition testimony of [p]laintiff's proffered expert, Ivey Gilmore." (Doc. 128 at 1).  Mr. Gilmore is a lawyer who provides opinions regarding the propriety of Alfa's conduct in this case.  In opposing

summary judgment, the plaintiff cites to Gilmore's opinions stated in: 1) his expert disclosure report, provided pursuant to Rule 26 of the Federal Rules of Civil Procedure[8], and 2) his deposition.   As to the expert report, Alfa targets "opinions in paragraphs 1, 2, 4, & 5 [which] state, in part, that Alfa acted 'intentionally' and in 'bad-faith.'" (Doc. 128 at 4, ¶ 13 (citing doc. 123-1 at 6-8)).   As to Gilmore's deposition testimony, Alfa objects to one specific section where Gilmore testified "'that Walker and Alfa acted "intentionally," "wrong[fully]," and deplorabl[y].'" (Doc. 128 at 4 (citing doc. 115-1 at 63(16)).[9] The court will address each source separately.

### A.   **Standard**

In evaluating expert testimony, the Eleventh Circuit Court of Appeals has outlined the following analysis:

---

[8]  The expert disclosure is attached to, and incorporated by, Gilmore's declaration.  (*See* doc. 123-1 at 2) ("A true and correct copy of my March 2, 2015[,] report that accurately reflects my qualifications, professional opinions and documents relied upon in forming such opinion is attached hereto[.]").  There is no objection that the report is improper evidence because it is hearsay, and/or not sworn.

[9]  These are the only specific sections Alfa cites from either source.  The motion could be read at points to argue that all of Gilmore's opinions, specified or not, should be stricken.  (*See* doc. 128 at 1 (arguing that this court should strike "the affidavit [incorporating the report] and deposition testimony"); *see also*, doc. 128 at 6 ("Mr. Gilmore's expert opinion testimony must be stricken")).  Elsewhere, the motion seems more focused on the specific sections cited to the court.  (*See* doc. 128 at 6 (seeking to "strike the testimony of Ivey Gilmore as set forth above")).  Further complicating this court's task is the fact that the motion is mostly a series of unrelated statements of law, with no analysis.  (*See* doc. 128 at 2-3).  Regardless, the court has attempted to apply Alfa's general attacks, such as that Gilmore is not qualified, to his opinions and statements as a whole, from all sources. More specific attacks on particular opinions, such as Gilmore's opinion that Alfa acted "intentionally" and in "bad faith," will be directed only to those portions cited by Alfa.  To the extent that the court strays from this approach, it will note as much.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. FED.R.EVID. 702. That rule requires a district court to engage in a three-prong inquiry, considering whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in [*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

[*United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004)] (*quoting City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 561 (11th Cir.1998)). The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. *Id.* (*quoting* [*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002)]); *see also* [*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469 (1993)].

*United States v. Wilson*, No. 12-14449, 2015 WL 8956435, at *15 (11th Cir. Dec. 16, 2015).

## B. <u>Qualifications</u>

In a conclusory fashion, specifically one sentence of its motion, Alfa merely states that "Mr. Gilmore is not qualified to give admissible testimony under FED. R. EVID., Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." (Doc. 128 at 1-2). This argument is not further developed. For that reason alone the motion, <u>on this ground</u>, is due to be denied. Regardless, as shown below,

Gilmore is qualified.

> The Eleventh Circuit has stated that

> experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, *experience,* training, or education." (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone ... may not provide a sufficient foundation for expert testimony." Fed.R.Evid. 702 advisory committee's note (2000 amends.).

*Frazier*, 387 F.3d at 1260-61 (emphasis in original).

Mr. Gilmore's resume reflects that he has worked as an insurance claims adjuster, or insurance defense attorney, since May of 1990. (Doc. 115-1 at 32). Gilmore worked as an automobile claims adjuster and appraiser for Crawford & Company Insurance Adjusters from 1990 until 1993. In 1993, Gilmore went to work for Cincinnati Insurance Company as a Multi-Lines Claims Adjuster and Catastrophe Adjuster. In that position, he handled workers' compensation, complex property loss, complex casualty loss, and complex casualty claims. He also was responsible for monitoring litigation files, participating in mediations on behalf of the company, and testifying as a corporate representative. (Doc. 115-1 at 32, 60). In his deposition, Gilmore testified that "multi-line adjusters handled everything, liability coverage and worker's comp[ensation]" and that he "handled multi-million dollar property losses." (Doc. 115-1 at 5(18)).

Furthermore, Gilmore testified that he handled complex liability, which he described as "serious fatalities, serious catastrophic injuries, serious liability claims" such as "[s]omething greater than a sprain or a strain, you know, where you have got someone who has been maimed or killed." (Doc. 115-1 at 5(19-20)).

While at Cincinnati Insurance Company, Gilmore attended law school at night. During the same time frame, he served as company representative in over a hundred mediations throughout North Alabama. (Doc. 115-1 at 6(22)).  In his expert disclosure, Gilmore states that he received his Juris Doctor from Birmingham School of Law in 1999, and thereafter "immediately received his Alabama law license." (Doc. 115-1 at 60). Thereafter, Gilmore practiced law with the firm of Burgess & Hale (formally Lamar, Burgess, Hale, Miller, Norris & Fieldman) from 1999 until 2002. (Doc. 115-1 at 60). He worked as an insurance defense attorney "on numerous complex civil cases, participated in several intricate jury trials, and obtained summary judgment in favor of his client in many other high-exposure cases." (Doc. 115-1 at 60).

In 2003, Gilmore began practicing at Owens & Millsaps, and became a partner in that firm in 2006. (Doc. 115-1 at 32, 61). While there, he "continued to handle high-exposure cases, including jury trials and further maintained a successful record obtaining summary judgment in favor of his clients in other difficult cases." (Doc. 115-1 at 61).  In 2010, Gilmore co-founded the law firm of Gilmore, Poole & Rowley, LLC

(formerly Gilmore & Poole), where he is currently an active partner. (Doc. 115-1 at 32). That firm also handles "insurance defense" as part of its practice.  (Doc. 115-1 at 32).

An expert is qualified "by [(1)] knowledge, [(2)] skill, [(3)] experience, [(4)] training, or [(5)] education." FED.R.EVID. 702 (brackets inserted). Mr. Gilmore's opinions focus on the standard of care, and alleged breach thereof, applicable to: investigating and settling cases (doc. 123-1 at 6); handling the claims process (doc. 123-1 at 7); evaluating cases for settlement (doc. 123-1 at 7); managing litigation (doc. 123-1 at 7); keeping the insured and clients properly informed (doc. 123-1 at 7); managing potential conflicts of interest (doc. 123-1 at 7); engaging in post-verdict litigation (doc. 123-1 at 8); and advising and directing the conduct of the insured/client after a judgment has been rendered against them (doc. 123-8).  Gilmore states that his opinions are "based on the methodology used in evaluating/managing claims and litigation during [his] career in the insurance industry and [his] career overall." (Doc. 115-1 at 63).  After due consideration of the above qualifications, and in the absence of any specific objection, this court holds that Gilmore has demonstrated sufficient "knowledge, skill, experience, training, or education" so that, for summary judgment purposes, he is qualified to render the opinions noted, and opinions closely related thereto.

C.    **The Expert Report**

The specific sections of the report to which Alfa objects state, in pertinent part:

– "Specifically, it is my opinion that Alfa had at its disposal enough information and facts but despite the information and evidence procured during the discovery process, it <u>knowingly and intentionally</u> placed its insured in peril by repeatedly ignoring the underlying [p]laintiff's demand for a policy limit settlement." (Doc. 123-1 at 7) (emphasis added).

– "It is my opinion that <u>Alfa acted in bad-faith</u> by failing to provide it[]s insured with copies of the demand to settle letters written by the underlying [p]laintiff's counsel during the underlying case. Alfa's conduct was <u>intentional and wrongful</u> in that it represented to its insured that the underlying case was winnable despite the actual facts known to Alfa." (Doc. 123-1 at 7) (emphasis added).

– <u>Alfa acted in bad-faith</u> by failing to process and provide to the insured the settlement demands in a timely manner and making the true risk known to the insured in such a way that the insured could read the letters and perceive the obvious danger that was at hand which ultimately resulted in an excess verdict." (Doc. 123-1 at 7) (emphasis added).

– "It is my opinion that <u>Alfa acted in bad-faith</u> by failing to conduct any post verdict action to protect its insured. Rather, Alfa acted with <u>a conscious disregard of Ashley Murphree's rights</u> by placing her in touch with a bankruptcy attorney and asking her to sign a covenant not to sue in exchange for Alfa paying the bankruptcy attorney's fee. Alfa's conduct post verdict, clearly demonstrates its <u>conscious disregard</u> for its insured's financial exposure and Alfa's bad faith." (Doc. 123-1 at 8) (emphasis added).

– "It is my opinion that all of the conduct described [in the expert report] was <u>intentional and in bad-faith</u> and completely against its insured's financial interest. Furthermore, it is my opinion that Alfa failed miserably to protect its insured leading up to the trial and following the excess verdict. <u>Alfa acted in bad-faith</u> when it failed to take any post judgment action which could protect its insured. Rather, Alfa's decision to pay for a bankruptcy attorney and encourage bankruptcy shows <u>Alfa's intent to protect its own financial interest</u> rather than protect its insured's financial interest." (Doc. 123-1 at 8) (emphasis added).

The defendant argues that every opinion cited above should be stricken because "they merely state conclusory opinions based on the ultimate issues and fail to state

facts upon which the 'opinion' is based to assist the trier of fact." (Doc. 128 at 3-4) (*see also* doc. 128 at 6 ("The 'opinion' testimony of Gilmore is not based on a single fact[.]")).

The court notes first that

> An expert may testify as to his opinion on an ultimate issue of fact. FED.R.EVID. 704. An expert may not, however, merely tell the jury what result to reach. *Id.* at committee notes (merely telling jury what result to reach is not helpful to the jury and therefore is not admissible testimony). A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law. *United States v. Poschwatta*, 829 F.2d 1477, 1483 (9th Cir.1987); *United States v. Baskes*, 649 F.2d 471, 479 (7th Cir.1980).

*Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).   In this case, statements such as that Alfa acted "intentionally," "knowingly," and with a "conscious disregard for the rights of Murphree," might be admissible if there were some basis or explanation for that opinion in the report.  *See*, *Corey Airport Servs., Inc. v. City of Atlanta*, 632 F. Supp. 2d 1246, 1266-67 (N.D. Ga. 2008) *rev'd in part on other grounds sub nom. Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280 (11th Cir. 2009) (conclusion that City of Atlanta's actions were intentionally biased were admissible because expert explained why he reached that conclusion; if the trier of fact believed the expert, then the trier of fact may infer that the City intentionally discriminated).   However, in the instant case, none of the conclusions in Gilmore's report are supported by <u>specific</u> facts.   Although the plaintiff argues that the report reflects "a

well-reviewed record of facts upon which [Gilmore] based his opinions" (doc. 134 at 6), the <u>report</u> merely sets out generally the sources of evidence Gilmore "reviewed" when creating it. (Doc. 123-1 at 6).   Each of the opinions are supported in the report with only vague references to "facts."

For example, Gilmore discusses how Alfa "failed to exercise reasonable care," because it was "provided with enough discovery and information during its investigation which should have enabled [it] to recognize that liability was so great and clear that an excess judgment would result if the case was tried to a jury." (Doc. 123-1 at 7).   He does not specify "the discovery and information" to which he refers, and upon which he bases his conclusion that "Alfa failed to exercise reasonable care." (Doc. 123-1 at 7).[10] The report is replete with such vague references.   (*See id.* at 7, ¶ 1 ("Alfa had sufficient information at its disposal during the claims investigation and the discovery process in the defense of the underlying case that it should have tendered its limits of coverage to avoid subjecting its insured to an excess verdict"); *id.* at 7, ¶1 ("Alfa had at its disposal enough information and facts . . ."); *id.* at ¶2 (". . . [Alfa] represented to the insured that the underlying case was winnable . . ."); *id.* at ¶2 ("Alfa was armed with superior knowledge . . ."); *id.* at 7, ¶3 ("Alfa . . . fail[ed] to process and provide to the insured the

---

[10] Also, throughout the report, Gilmore is quick to opine that the standard of care was breached, but he is never clear as to what the standard of care <u>is</u> in any given situation.  For that reason as well, the opinions in the report would not be "helpful" to the trier of fact.

settlement demands in a timely manner and [failed to make] the true risk known to the insured . . ."); *id.* at 7, ¶3 ("Alfa . . . "fail[ed] to adequately and appropriately communicate the . . . policy limits demand and failed to emphasize the need to have outside counsel explain [the] risk . . .").

The plaintiff states that "Gilmore . . . made clear in his testimony that the report provided only a <u>summary</u> of his opinions." (Doc. 134 at 6) (emphasis added). The Eleventh Circuit has stated that

> [p]resenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough. The party offering the expert must present the witness' proposed testimony in a form that persuades the trial court that the testimony will in fact assist the trier of fact. As we have held previously, carrying this burden requires more than the *ipse dixit* of the expert.

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (internal quotations omitted).[11], [12] Because the report is <u>generally</u>

---

[11] Also, Rule 26 provides that an expert report must contain, *inter alia*: "(i) a complete statement of all opinions the witness will express <u>and the basis and reasons for them;</u> [and] (ii) <u>the facts or data considered by the witness in forming them</u>[.]" Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii) (emphasis added). Although the report is deficient in this regard, the defendant has not moved to strike Gilmore's testimony on this basis.

[12] The plaintiff cites *Samples v. Atlanta*, 916 F2d 1548, 1551 (11th Cir 1990), in which the following passage appears:

> The plaintiffs also argue that the district court erred in admitting testimony from the defendants' "use of force" expert. After establishing the witness's extensive qualifications as an expert in the field of the proper use of force by law enforcement officers, the defense attorney posed a hypothetical based on the facts already in evidence regarding what Officer Oglesby saw as he approached David Samples on the night of the shooting. The attorney then asked for the expert's

devoid of facts which support Gilmore's conclusions, <u>all</u> conclusions stated therein, in addition to those cited above, will be disregarded in ruling on the motion for summary judgment.

Further, all statements that Alfa acted "in bad faith" are also due to be stricken for the alternative reason that they do nothing more than to tell the jury what conclusion to reach. *See*, *Camacho v. Nationwide Mut. Ins. Co.*, 13 F. Supp. 3d 1343, 1367 (N.D. Ga. 2014) (expert may not testify as to whether insurer's conduct amounted to bad faith).[13]

---

opinion as to "whether or not it was reasonable for the officer to discharge his firearm when David Samples charged him with a knife." Over the plaintiffs' objection, the expert testified that in his opinion Officer Oglesby acted reasonably. We agree with the plaintiffs that the literal wording of the question posed tends to call for an answer that would invade the province of the jury, which in this case was to decide the reasonableness of the officer's actions. We find, however, that the questions leading up to this testimony, and the manner in which the expert answered the question, properly informed the jury that the expert was testifying regarding prevailing standards in the field of law enforcement. After posing the hypothetical, but before asking for the expert's opinion as to the reasonableness of the officer's actions, the defense questioned the expert regarding the industry standards for judging the appropriate use of force. The expert testified that he agreed with the standard as set out by a previous expert witness, which involved a three-pronged inquiry into the subject's ability to harm, his opportunity to harm, and whether someone was in jeopardy of being harmed by the subject at the time the officer used force against the subject. Then, in explaining his answer to the question posed, the expert spoke in terms of this three-pronged inquiry, analyzing David Samples's ability and opportunity to harm Officer Oglesby, and the jeopardy faced by the officer.

*Samples*, 916 F.2d at 1551. The instant case is distinguishable from *Samples* as the expert in this case has not specifically set out the facts upon which his opinions are based. Notably, even the plaintiff, in arguing for the application of *Samples*, states that opinions as to the ultimate issue are appropriate when such opinions are "thoroughly explored based on the facts." (Doc. 134 at 7). Gilmore's opinions in the report are not thoroughly explored.

[13] The plaintiff argues that use of the term "bad faith" is "regularly used in the lexicon of the industry." (Doc. 134 at 5). Gilmore does not state that he is using the phrase "bad faith" in that

Gilmore's expert report will not be considered in deciding the motion for summary judgment.

### D.     The Deposition

Alfa only attacks the following portion of Gilmore's deposition:

Q.      . . .What is the risk, in your opinion, to Ashley Murphree and how would Alfa be placing its financial interest ahead of its insured?

A.      That's a great question, and I have a good answer for you. First of all, I can't think of anybody in America that would just want to waltz into a bankruptcy filing and have bankruptcy placed on their shoulders for any reason. And at the end of this lawsuit, it was an excess judgment, a verdict; and had Alfa done what it should have done and settled this case, there would have never been an excess verdict and there would never have been, most likely, the need for bankruptcy. And then for Alfa to work in concert with the lawyer to go out and seek a bankruptcy lawyer and to pay for a bankruptcy lawyer and then, furthermore, get a release from this young lady while she is in jail, that's intentional, it's wrong, it's deplorable, and it shouldn't have happened.

(Doc. 115-1 at 16(62-63)) (emphasis added).

The opinions in Gilmore's deposition, although similar to those in his report, stand on a different footing than those in the report. Alfa has cited to only one segment of the deposition, without context. It is impossible, from what has been cited, to know whether the opinions stated by Gilmore have evidentiary support elsewhere in the deposition, or

---

sense, and he does not explain what constitutes "bad faith" in his opinion. For that reason, even if the phrase was not being used to describe the tort of bad faith, his opinion cannot be helpful to the jury. Further, the risk that the jury might confuse any "common" usage with the expert telling them that Alfa has committed the tort of bad faith, militates against allowing Gilmore to use the phrase.

21

otherwise have a proper foundation.

That being said, Gilmore's opinion that Alfa's conduct was "deplorable," is irrelevant, and will not assist the trier of fact.   It will be stricken from the cited deposition testimony. The remainder of the cited testimony, and Gilmore's other opinions in his deposition, are allowed.[14]

## III.   THE MOTION TO STRIKE "NON-COMPLIANT PORTIONS OF LEO'S RESPONSE TO ALFA'S MOTION FOR SUMMARY JUDGMENT." (DOC. 129)

In this motion, Alfa states:

3.      The following statements of fact by Alfa were not disputed with any reference to the record and should therefore be deemed admitted: Paragraphs 16, 17, 27, 28, 29, 30, 31, 32, 34, 37, 46, 60, 61, 64, 65, 68, 69, 70, 71, 72, 79, 82, 85, 86, 87, 90, 91, 92, 93, 98, 99, 100, 101, 102, 103, 115, 117, 129, 130.

4.      In numerous of the foregoing paragraphs, Leo merely states that he disputes that Alfa's citations to admissible evidence "establish[] the truth of the matter." See e.g., ¶¶ 17, 27, 34, 37, etc. In other paragraphs, Leo claims to dispute the truth of Walker's testimony, but cites no evidence in contradiction. See e.g., ¶ 28, 29, 30, 32, 68, 69, 71, etc. Leo's failure to state any evidence in contradiction allows this Court to establish the truth of the matters for summary judgment purposes. Fed. R. Civ. P., Rule 56(e)(2).

(Doc. 129 at 2).   Several of Alfa's facts reference the contents of documents.   The

---

[14] Alfa also attacks Gilmore's opinions as being based on the wrong standard of care because, according to Alfa, it cannot be liable when its insured opposed settlement.  (Doc. 128 at 5-6; doc. 137 at 3-4).  As noted later in this opinion, Alfa is wrong.  *See infra* at section IV.C.2.a. Regardless, this argument goes to the weight of Gilmore's opinion, rather than the admissibility.

plaintiff responds to many of these facts with the statement that he "does not dispute that the document states as it does, but [p]laintiff does dispute that what the document states establishes the truth of the matter." (Doc. 123 at 3). Similarly, when Alfa recounts Walker's testimony regarding what someone else (particularly Murphree) stated, the plaintiff often writes that he "does not dispute that Walker testified as stated. However, Plaintiff disputes that Walker's testimony establishes the content thereof as undisputed facts. The totality of the evidence reflects that Murphree was not fully informed." (Doc. 123 at 3).

This court requires that all facts which are "disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment*." (Doc. 9 at 16-17) (emphasis in original). The responses noted above contain no citation to the record supporting a dispute. These types of responses are merely undeveloped argument, more appropriate for to a motion to strike, which the plaintiff did <u>not</u> file. However, the plaintiff's response to the motion to strike does specifically attack three facts. The court will treat those specific arguments as a motion to strike <u>those specific facts</u>.

The plaintiff first specifically mentions paragraph 34 of Alfa's statement of

undisputed facts where it alleges: "On or about November 1, 2010, Walker reported to Lyon that she had explained to Burgess and Murphree the dangers in the case." (Doc. 133 at 2). The plaintiff argues that Walker's report to Alfa that she explained the dangers of the case is not evidence that she actually did so. Alfa responds that the fact is only offered for the purpose of establishing that Walker <u>reported to Alfa</u> that she had explained the dangers of the case to Murphree and Burgess. (Doc. 135 at 2-3). It is not hearsay and will not be stricken.

Next, the plaintiff attacks paragraphs 28 and 71 of Alfa's facts, because they cite to Walker's deposition, where she testified that she and Murphree spoke regarding "the risks of [an] excess verdict," and that Murphree verbally stated to Walker that she understood the risks. (Doc. 133 at 3-5). Unlike Burgess's declaration, these statements <u>are</u> evidence of Murphree's mental impression and are therefore admissible. FED. R. EVID. 803(3). Further, a statement by a party, which is offered against that party, is not hearsay. FED. R. EVID. 801(d)(2).[15] These facts will not be stricken.

That having been said, Alfa's motion to strike will be denied. In its ruling on the motions for summary judgment, the court will examine each individual fact Alfa cites and determine, at that time, whether, pursuant to the terms of the scheduling order, and the applicable rules, the fact should be included. However, generally, to the extent that the

---

[15] Leo, as bankruptcy trustee, stands in the shoes of Murphree. *In re Halabi*, 184 F.3d 1335, 1337 (11th Cir. 1999).

plaintiff's responses are similar to those noted herein, Alfa's cited facts will be deemed to be admitted <u>as stated</u>. Still, as to documents, as it did above, the court will merely deem as true, for summary judgment purposes, that the cited document contains the language the proffered fact alleges it contains. That does not mean that the court deems the language itself to be stating a truth. As to instances where the plaintiff disputes the truth of a statement made by a deponent, at their deposition, the court generally will note the deponent, and the testimony given by the deponent. In its analysis, the court will examine the probative value of any such testimony–*i.e.* whether there is any evidence which disputes said testimony.

## IV. THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOCS. 103, 105)

### A. <u>Standard</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing

the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden  depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment

by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a

directed verdict at trial on the material fact sought to be negated. *Id.*

**B.**     **Facts**

The plaintiff, Rocco J. Leo, is the Trustee for the bankruptcy estate of Ashley Murphree, who is now deceased.  The fees and costs associated with that bankruptcy were paid by defendant Alfa, who provided automobile liability insurance to Murphree and who, pursuant to that insurance policy, retained Walker to defend Murphree in the Underlying Action. Alfa's payment of those fees arose out of Murphree's post-judgment "Request for Assistance in Filing for Bankruptcy and Covenant Not To Sue" ("Covenant Not To Sue"), drafted by Walker without talking to Murphree, and signed by Murphree at a time she was represented by Walker and Wagner and, because she was in jail, had no access to other counsel.  (*See* Doc. 1-8 at 2).  The circumstances that led up to the Covenant Not To Sue, and the Covenant Not To Sue itself, are the focus of the claims in this case.

**1.**     ***The Car Accident Between Murphree and Cameron***

The story of this case begins on January 25, 2010, when Murphree and Cameron were in an automobile accident.  Each party contended that they had the green light and that the other was at fault.

An accident report was created by Officer Michael Prater.   In the narrative summary section of that report, Officer Prater initially wrote:

> According to [Cameron,] the driver of Unit #1[,] and all three witnesses[,] Unit #1 was making a left turn off Country Club Drive onto Rainbow Drive on a green traffic signal when she was hit by Unit #2 [driven by Murphree]. All said that Unit #2 ran the traffic signal. The driver of Unit #2 said that her light was . . . green.

(Doc. 109-11 at 10). The report named Frankie Alford as "witness #1," Jean Walker as "witness #2," and Jessica Clayton as "witness #3." (Doc. 109-11 at 10-11).

Subsequently, Officer Prater revised the accident report. In addition to the quoted language above, Prater wrote that, on January 28, 2010, he "spoke with witness #1 [(Frankie Alford)] who said that Unit #1 [(driven by Cameron)] ran the redlight [sic] and caused the accident." (Doc. 109-11 at 6). When asked at trial about this addition, Prater explained that, about an hour after the accident, while at the hospital, he was speaking with Alford. (Doc. 103-9 at 9(344)-10(345)). He stated:

> Somewhere in the conversation while we were there Ms. Alford – something was brought up about the light and that Ms. Cameron had ran [sic] the light. And I remember bringing Ms. Alford outside the room. And I said tell me again what you saw at the accident. And she said that she had saw [sic] Ms. Cameron run the light. And I was – and again, I asked her, I said, I was under the impression you told me – when she first told me, she had a green light and made a turn on the green light. But her story had changed. So at that point, that's when I went back to the station, and I called the other witness[es] back to make sure we were all on the same page.

(Doc. 103-9 at 10(345)).[16]

_____

[16] The plaintiff proffers the following fact: "The phone call from Alford to the investigating officer was instigated by a phone call from Michelle Burgess (Murphree's mother) to Alford. (Depo. of Frankie Alford p.59:7-15)." (Doc. 122 at 7-8). Nothing in the cited material discusses a phone call from Alford to the officer. The cited portion of Alford's deposition discusses a call from

### 2.   *Alfa's Investigation*

Cameron claimed $247,465.52 in medical bills resulting from the accident, and sought payment from Alfa.[17]   Alfa district claims manager, Doug Lyon, assigned Robby Elrod to adjust and investigate the claim.

On February 5, 2010, Elrod spoke to Murphree who said that she, Murphree, had the green light, and Cameron had the red light.[18]   Also, the following exchange occurred:

> RE (Robby Elrod): Okay and so what's the first time you caught view of her?
>
> AM (Ashley Murphree): Well I saw her right before we hit her, but I saw her car way before that.

(Doc. 103-2 at 15).  Murphree's statement continues:

> RE: Okay if you will now just go ahead and describe for me what happened as you approached the intersection and what happened as far as the accident happening?
>
> AM: Okay, we were driving on the way home and ah the little old lady I like saw her stopped there before I got to her but she didn't stop she just kept going.

---

Burgess to Alford, and reads: "[s]he wanted to know did I – how did I see it.  And I told her.  And she said well, the policeman said that I had changed my story.  And I said 'No, I have not.'" (Doc. 122-6 at 16(59)).

[17]   Murphree's father, Charles Burgess, was insured by Alfa.  His policy covered Murphree.  (Doc. 1-1 at 7).

[18]   In his affidavit, Lyon refers to these statements as "testimony."  (Doc. 103-1 at 3).  There is no indication that these statements were taken under oath, or in any other manner which would qualify them as "testimony."  Accordingly, the court refers to them as "statements."

RE: And you are saying that she did not stop, she pulled up and as she got towards the intersection she just kept coming?

AM: It looked like she stopped but she was going as slow as she could and when we got right there at the light, she didn't pull up in time.

(Doc. 103-2 at 14).

On February 3, 2010, Elrod took a statement from witness Frankie Alford, who said that she was directly behind Cameron when Cameron ran the red light, causing the car accident with Murphree. Alford (who is also known as "Copeland") told Elrod that Cameron never stopped for the light, even though Cameron's light was red, and that Cameron just went straight into the intersection at about 15 miles per hour.

In contrast to the statements of Murphree and Alford, on February 5, 2010, Jessica Clayton told Elrod that she believed Murphree, not Cameron, had the red light. Further, Elrod obtained a copy of a notarized statement by Jean Walker (also known as "Jean Walker Nelson") who stated that she was stopped at the traffic light, heading in the same direction as Murphree, and that Murphree ran the red light. Finally, on February 11, 2010, Cameron told Elrod that she, Cameron, had the green light, and that Murphree was the one who had run a red light.

### 3.  The Underlying Action Begins

On April 1, 2010, Cameron filed a lawsuit, in the Circuit Court of Etowah County, Alabama, against Murphree and her father, Charles Burgess ("Charles"), for negligence,

wantonness, and negligent entrustment.[19]   Cameron was represented by attorneys Ted Mann and Robert Potter of the law firm Mann & Potter, P.C. On or about April 6, 2010, Lyon assigned defendant Walker to represent Murphree and Charles.

On May 20, 2010, Walker reported to Lyon that Cameron's attorney had advised that Cameron had suffered a broken hip and neck, and that medical bills exceeded $100,000. (Doc. 109-2 at 22).[20] However, Walker stated "I feel certain [that] is not the subrogated amount."   (Doc. 109-2 at 22).   Walker also stated that she had found inconsistencies between the police report and the witness statements that discredited the witnesses who said Cameron had the green light.

### 4.   *The Initial Settlement Demand*

Depositions of the parties occurred in early October 2016.   After they were concluded, but before Walker and Mann had left the location of the depositions, Mann verbally made a settlement demand to Walker, and sought Murphree's full policy limits–$100,000.

Walker reported the settlement demand to Lyon in an October 12, 2010, letter,

---

[19]  The lawsuit also named State Farm Mutual Automobile Insurance Company ("State Farm") (Cameron's insurance company), and, against that entity, sought uninsured/underinsured motorist benefits.  (Doc. 103-13 at 10).  State Farm's involvement is not relevant to the issues before this court, and will not be further discussed in this opinion.

[20]  The plaintiff cites this letter as evidence that "Both Walker and Alfa knew very early in the case that Cameron was seriously injured and incurred large medical bills."  (Doc. 122 at 8). Walker correctly notes that the phrases "very early in the case," "seriously injured," and "large medical bills," are vague.  (Doc. 130 at 2).  The letter will speak for itself.

and stated that, even considering collateral sources, "this is a case that could easily result in a verdict in excess of policy limits." (Doc. 109-3 at 6).   Furthermore, Walker acknowledged to Alfa that "[i]f there is even a slight chance that the favorable witness testimony will not hold up at trial, we need to consider settling because this is a very dangerous case." (Doc. 109-3 at 6).  Walker noted that Murphree "did a good job [in her deposition]," but Walker was "not sure that she will come across well at trial."  (Doc. 109-3 at 6).  Walker was also "even more concerned about her mother [Burgess], since she tended to be argumentative."  (Doc. 109-3 at 6).  Walker was "reluctant to settle" and stated that she would like to depose the witnesses and assess their testimony before settling.   (Doc. 109-3 at 6).  Walker explained that there could possibly be an additional witness, Jessica Clayton's brother, who would testify that Murphree had run a red light.

In a letter dated October 13, 2010, Mann followed up his verbal settlement demand with a written one.  Again, Mann demanded Murphree's $100,000 policy limits. (Doc. 109-3 at 7).[21]  The letter advised that Murphree was inadequately insured given the amount of Ms. Cameron's injuries and specifically requested that Walker advise Murphree that, if the plaintiff was successful in obtaining an excess verdict, she would "attempt to collect every penny from [Murphree] personally." (Doc. 109-3 at 7).

---

[21] When asked in deposition if she "ever actually [gave] Ms. Murphree any of Mr. Mann or Mr. Potter's actual demand letters," Walker testified: "I think I probably showed them to her whenever we met." (Doc. 109-1 at 37(146)).

On October 14, 2010, Lyon, responding to Walker's letter of October 12, sent an email to Walker stating that he saw the need to take the witness depositions to see how credible they were, and "[a]fter that we can make a more knowledgeable decision." (Doc. 103-2 at 14).

### 5.    *Walker's Early Reports to Murphree.*

In a letter dated October 21, 2010, Walker advised Murphree that, after Murphree had left her deposition, Mann "had a bit of a temper tantrum.  He apparently thought that I would just agree to hand over your policy limits."  (Doc. 109-3 at 11).  Walker also noted that Mann had followed up with the letter of October 13, 2010.  Walker described Mann's letter as a "threatening letter wherein [Mann] demanded policy limits."   (Doc. 109-3 at 11). Walker informed Murphree that "this is a dangerous case if we lose on liability, since Mrs. Cameron had extensive injuries." (Doc. 109-3 at 11).  Walker also stated that, because of conflicting witness testimony, there was a dispute as to liability and that she would be better able to evaluate the case after depositions of the witnesses. That letter did not inform Murphree about Mann's threat to attempt to recover any excess judgment from her personally.  It also did not discuss Walker's concerns about Murphree and her mother testifying at trial.

A letter dated November 1, 2010, from Walker to Lyon, advises of the policy limits demand against Murphree.  (Doc. 109-3, p. 17).  Walker explained to Alfa that

Mann threatened to collect any excess judgment against Murphree personally.   Walker also stated that she had "explained in writing to . . . Murphree the dangers in this case, should we lose on the issue of liability."   (Doc. 109-3 at 17).   Walker again stated to Lyon that she thought the depositions of the witnesses and investigating officer would assist in helping to evaluate whether the case should be settled.

On November 2, 2010, Lyon emailed Walker and asked if Alfa needed to send Murphree an excess letter. (Doc. 103-3, at 18). The very same day, Alfa increased its reserves to the bodily injury policy limits of $100,000. (Doc. 103-1 at 5).   On November 3, 2010, Walker responded to Lyon, via email, and told him to hold off on sending the excess letter, and that Walker was "keeping the insureds very informed about the dangers, etc., and have advised them to get their own attorney, should they wish to do so." (Doc. 103-3 at 20).   Walker noted: "We will re-evaluate after I depose the witnesses and the investigating officers." (Doc. 103-3 at 20).

On November 10, 2010, Mann wrote to Walker, informing her that "this is a policy limits case and [we] would be happy to entertain payment of policy limits to settle this case[.]" (Doc. 1-3 at 2).   In that same letter, Mann also gave Walker a list of liens against Cameron.  (Doc. 1-3 at 3).

On November 30, 2010, the trial judge in the Underlying Action granted Walker's motion for partial summary judgment on the negligent entrustment claim against Charles,

and he was dismissed from the Underlying Action.

### 6.  *Walker Reports on the Grounds for a Defense*

A January 19, 2011, letter from Walker to Lyon informed Alfa that Cameron had proven "her cervical and pelvic fractures and other injuries," and "Trinity's approximately $90,000 invoice." (Doc. 109-4 at 5).   Walker also advised that she spoke with Officer Prater and he informed her that Alford, had initially told him that Cameron had the green light and then changed her story to say that Cameron ran the red light. (Doc. 109-4 at 6). Walker further advised that the investigating officer came across as straightforward, would make a good witness, and might damage the credibility of Alford, their one favorable witness. (Doc. 109-4 at 6). She also reported that the eye-witnesses who were unfavorable to Murphree had credibility problems.   Walker reported that the depositions of two of Cameron's doctors had been taken and then stated:

> I have established through both doctors that Ms. Cameron had pre-existing lupus and clotting disorders, and was on several prescription medications at the time of the accident . . . to raise doubt about Ms. Cameron's driving ability at the time of the accident.

(Doc. 109-4 at 5).

In a January 19, 2011, email from Lyon to Walker, Lyon agreed that they should get the witness statements and inquired whether they could then decide to settle or try the case. (Doc. 103-4 at 5).  In a January 19, 2011, email from Walker to Lyon, Walker stated:

36

The only reason we may want to consider settling before then is because plaintiff's attorney has six medical depositions scheduled before the witness depos [sic] and I need to file numerous subpoenas. However, if we settle [an unrelated case], that would free up the week of February 7th, so I could go ahead and depose the witnesses that week, and then we could decide before all the medical depos [sic] are taken. This [unrelated case] will be a policy limits settlement, also.

(Doc.103-4 at 5).

On February 4, 2011, Walker sent Lyon an email stating that the subrogation claims for Blue Cross and Medicare were $3,292.92 and $30,481.41, respectively, which made the case "less dangerous." (Doc. 109-4 at 8). Walker reported that Cameron had a history of dizziness and balance problems, blood clots, and lupus and that there was a good chance for a defense verdict. Walker further explained that the jurors would likely know that Cameron lives near the Country Club, and that her son-in-law is a doctor, which would mitigate damages and that the jury pool would include people who would more likely relate to Murphree than to Cameron.

On February 15, 2011, Walker sent Lyon an email stating that the witness favorable to Murphree, Frankie Alford Copeland, was 100% sure that Cameron had run the red light. A February 21, 2011, email from Lyon to Walker stated that after Walker obtained the witness depositions, "we need to discuss if we want to try the case or settle." (Doc. 103-4 at 11).

On or about April 4, 2011, Lyon received another report letter from Walker

stating that Copeland presented as a strong and credible witness in her deposition. Walker said that a jury could infer from Copeland's testimony and from Cameron's pre-existing medical problems that Cameron was confused or impaired, which caused the accident. Walker also reported that Cameron's uninsured motorist carrier, State Farm Insurance Company, had opted out, making an additional $25,000 in coverage available to Murphree.

### 7.   *Walker's Second Letter to Murphree*

A letter dated June 29, 2011, from Walker to Murphree, updated Murphree on the activity on her case. (Doc. 109-4 at 30). Walker stated: "As you know, Ms. Cameron had very significant injuries, which makes this case dangerous. If the jury finds you liable, then they may very well return a large verdict. You have $100,000 policy limits." (Doc. 109-4 at 31-32).[22] Walker also told Murphree that "[Trinity Hospital's] invoices total $90,000," and set out that Gadsden Regional charges were $18,884.36. (Doc. 109-4 at 32-33). Walker stated that Copeland was a very strong witness for Murphree, although an officer would testify that Copeland had changed her story. (Doc. 109-4 at 31). Walker

---

[22]  This fact was proffered by Walker. It originally began: "On June 29, 2011 Defendant Walker again wrote Murphree, and apprised her of the policy limits settlement demand." (Doc. 107 at 6). Wagner then cited the quoted portion of the letter as evidence of her "apprising" Murphree of the settlement demand. *See id.* ("Specifically, Walker wrote: 'As you know, Ms. Cameron had very significant injuries, which makes this case dangerous. If the jury finds you liable, then they may very well return a large verdict. You have $100,000 policy limits.'"). This language does <u>not</u> advise Murphree of a <u>settlement demand</u>, only the limits of the policy.

reported that there were three witnesses who supported Cameron–Jean Walker, Jessica Clayton, and Neal Clayton–all of whom were "very poor" witnesses. (Doc. 109-4 at 31).

### 8.    *Resumption of Reports to Alfa*

On or about October 6, 2011, Walker sent Lyon a report reiterating that liability was disputed, that there was a very favorable witness for Murphree, and that the witnesses for Cameron did not make sense.   Walker reported that she had an expert witness, Dr. Page, who would testify that Cameron's preexisting medical conditions could have impaired Cameron's driving abilities and that Cameron's post-accident deep vein thrombosis was not necessarily a result of the accident, both of which could serve to both mitigate damages and help defend the issue of liability.

### 9.    *The Exclusion of Murphree's Expert in the Underlying Action*

On March 5, 2012, Cameron filed a motion to exclude Murphree's expert, Dr. Page.  The motion was granted, at least in part.  On May 4, 2012, Walker wrote Murphree and informed her that Dr. Page had been excluded from testifying that Cameron should not have been driving given her pre-existing conditions, but that she was hopeful he would be able to testify about her pre-existing conditions from the standpoint of trying to limit damages.

On July 16, 2012, Walker wrote Cameron's attorneys in response to requests for dates to re-depose Dr. Page, and advised that she did not plan to use Dr. Page at trial.

(Doc. 109-6 at 19).   On July 25, 2012, Walker wrote Murphree regarding the trial date, which, at that time, was August 27, 2012.   (Doc. 109-6 at 23). In that letter, Walker did not inform Murphree that Dr. Page would not be testifying at all.

### 10.   *Alfa's Offer to Mediate and the Second Settlement Demand*

Walker testified that she "was given authority to mediate and I offered and nobody took me up on it."   (Doc. 109-1 at 41(161)).    The following exchange took place in Lyon's deposition:

A.   We talked about possibly mediating it.

Q.   And what is your recollection of that discussion?

A.   [Cameron's attorneys] did not want to. It was full limits or nothing.

Q.   Do you remember anything else?

A.   In regards to?

Q.   Discussion about mediating it with Ms. Walker?

A.   That Cameron didn't want to mediate it is my understanding, [Cameron's] attorney.

Q.   Right. They were at only -- they were insisting on a policy limits settlement?

A.   That's my understanding.

(Doc. 103-19 at 46(179-180)).   Walker testified that she told Mann that she would mediate the case from a position of "disputed liability," which she says Mann interpreted

as an offer to settle for $50,000. (Doc. 109-1 at 43(170)).   Walker stated in her deposition that   "disputed liability" in this case meant   negotiating within policy limits. The parties did not mediate.

### 11.   *More Demands*

A March 22, 2012, letter, from Potter to Walker, made another demand for policy limits,   and   informed   Walker   that   should   Cameron   obtain   an   excess   verdict,   Cameron would enforce it against Murphree personally.   (Doc. 1-4 at 6). The letter indicated that the demand would expire after 14 days.   The letter also stated: "[y]our settlement offer literally puts nothing in Ms. Cameron's pocket after my expenses and the subrogation claim." (Doc. 1-4 at 6).

A   March   30,   2012,   letter   from   Walker   to   Lyon   discussed   the   policy   limits demand,   inclusive   of   the   14-day   time   limit   stated   by   the   attorneys   for   the   plaintiff   in   the Underlying Action. She also told Lyon that Cameron's attorneys had threatened to collect any excess verdict from Murphree personally.   Walker provided the opinion

> I think they are just blowing smoke, because I think they would be glad to get $100,000 at any time.   Second, I have heard them say in court proceedings that they never try to recover anything other than policy limits. Third, I am not convinced that Ms. Cameron's family would allow her attorneys to try to take the assets of a young woman.   However, as you know, since Ms. Cameron has such extensive medical injuries, there is the possibility of an excess verdict, if the jury believes that she ran the red light.

(Doc. 109-5 at 27).   Walker also wrote:

> In the event we do not prevail on the issue of liability, then I am taking several steps to attempt to keep the verdict low. We have $100,000 limits, plus there is an additional $25,000 available in underinsured motorist coverage from Ms. Cameron's automobile policy with State Farm. The plaintiff will put $245,000 in medicals on the board, but we will be allowed to show that almost all of this amount was paid for by Blue Cross and Medicare. They can then come back and show that they will have to repay Medicare and Blue Cross approximately $30,000.

(Doc. 109-5 at 29).

The record also reflects a March 30, 2012, letter from Walker to Murphree which

stated:

> I first want to advise you that Ms. Cameron's attorneys have made a demand for your policy limits of $100,000. This is nothing new, but they have put a 14 day time limit to respond. They say that if we do not offer the limits within 14 days, then they are taking the offer off the table, and they will try to recover any excess verdict from you.

(Doc. 109-5 at 30). The letter then, nearly word for word, restated what Walker had

written to Alfa stating:

> I think they are just blowing smoke, because I think they would be glad to get $100,000 at any time. Second, I have heard them say in court proceedings that they never try to recover anything other than policy limits. Third, I am not convinced that Ms. Cameron's family would allow her attorneys to try to take the assets of a young woman. However, as you know, since Ms. Cameron has such extensive medical injuries, there is the possibility of an excess verdict, if the jury believes that you ran the red light.
>
> * * *
>
> In the event we do not prevail on the issue of liability, then I am taking several steps to attempt to keep the verdict low. You have $100,000 limits,

> plus there is an additional $25,000 available in underinsured motorist
> coverage from Ms. Cameron's automobile policy with State Farm.
> [Cameron] will put $245,000 in medicals on the board, but we will be
> allowed to show that almost all of this amount was paid for by Blue Cross
> and Medicare. They can then come back and show that they will have to
> repay Medicare and Blue Cross approximately $30,000.

(Doc. 109-5 at 30-31). Walker also advised Murphree: "Please feel free at any time to

hire your own attorney if you are not satisfied with the job I am doing, and/or to advise

you regarding any possible excess verdict." (Doc. 109-5 at 30). Walker did not specify

in this letter the date the demand had been made, or the date when it would expire.

Walker did not, in this letter, inform Murphree concerning subsequent negligence, and

that the jury could find Murphree liable even if Cameron ran the light.

### 12.    *Alfa Informs Murphree of the Potential for an Excess Verdict*

The record reflects an April 3, 2012, letter from Alfa to Murphree, sent via

certified mail, which was signed for upon receipt by Murphree. In that letter, Alfa advised

Murphree, as follows:

> Because the amount of damages claimed by the plaintiff is considerably
> more than the $100,000.00 liability limits afforded by your insurance
> policy, there is a possibility that a judgment could be rendered in excess of
> your liability coverage. Because of this I want to be sure you are aware that
> you could be liable for any excess judgment. You may wish to retain an
> attorney, at your expense, to advise you regarding this potential personal
> liability.

> If for any reason you feel we should not proceed in trying this case and you
> feel we should pay your policy liability limits, please be sure to let me and
> your attorney Rebecca Walker know as soon as possible. If we do not hear

from you in regards to this potential excess liability I will assume you wish
for Attorney Walker to proceed in defending you in the above referenced
case.

(Doc. 111-21 at 34). Although Alfa's excess letter mentioned a policy limits demand, it
did not specify that there was a deadline or what the deadline was.

An April 12, 2012, Walker sent a letter to Lyon advising that Walker had not heard
anything from Murphree concerning the excess letter and assumed she was agreeable
with proceeding to trial. (Doc. 109-5 at 35). Walker also reported that there were
medical records that showed that Cameron had no memory of the accident, which
contradicted her previous testimony and supported the theory that Cameron was having
some type of confusion before the accident. Walker also advised that she thought they
had a good chance at a defense verdict, and "if not, hopefully not an excess verdict."
(Doc. 109-5 at 36).

### 13. *Walker Reports that Murphree Wanted To Go to Trial*

An August 10, 2012, letter from Potter to Walker made substantially the same
offer as Potter had in his March 22nd letter. (Doc. 1-5 at 2). Also, in this new letter,
Potter specifically wrote:

We assume that someone has informed Ms. Murphree of the following:

1.    That [Murphree] has a limitation of coverage;

2.    That [Cameron's] medical expenses exceed $100,000;

3.    That there is a potential that a verdict may exceed [Murphree's] coverage limits;

4.    That [Murphree] had been advised that should [Cameron] obtain an excess verdict, we intend to satisfy the entire judgment against [Murphree] personally; and

5.    That [Murphree] has the right to obtain personal counsel to advise her and protect her rights relative to a potential excess verdict.

(Doc. 1-5 at 2).   There is also a second August 10, 2012, letter from Potter to Walker in which he again stated substantially the same things as his first letter of that same date. (Doc. 1-6 at 2).   The second letter also stated, "I assume, at this point, our policy limits demand has been rejected." (Doc. 1-6 at 2).

The record reflects several August 2012, emails from Walker to Burgess regarding trial preparation.    None of those emails mention the August 10th demand. (Doc. 109-6, at 29-30,33).

On August 23, 2012, Lyon received an email from Walker in which Walker reported that she had met with Murphree and Burgess, and that they were ready to go forward with trial.    Thereafter, at some point, the trial was continued from August 27, 2012, to February 25, 2013.

In a September 17, 2012, letter from Walker to Burgess and Murphree, Walker noted that the trial date was February 25, 2013, and stated that Walker would contact

them closer to trial.  (Doc. 109-7 at 2).  The letter did not mention the August 10, 2012, letter from Potter.   An October 26, 2012, letter from Walker to Lyon noted the postponement of the trial. It also reported that Walker had met with Murphree and her mother, and that Walker had again explained the danger of an excess verdict to Murphree. The letter stated that Murphree and her mother "want to go forward with trial."  (Doc. 109-7 at 3).[23]  The letter does not  mention the demand letter of August 10.

### 14.     *Walker Is Informed of Murphree's Arrest*

In a email dated January 25, 2013, from Walker to Burgess,  Walker reminded Burgess that trial was "still set for February 25th."  (Doc. 109-7 at 5). A January 25, 2013, email response from Burgess to Walker informed Walker that Murphree had been arrested, and asked that Walker have the trial postponed.  (Doc. 109-7 at 5).

### 15.     *Renewed Demand for Policy Limits Following Arrest*

In a January 28, 2013, letter from Potter to Walker, Potter this time stated that he assumed that Walker had "been made aware of [her] client's recent alleged criminal activities."  (Doc. 1-7 at 2).   In the same letter, Potter also asked Walker to "[p]lease advise Alfa of these events as well as our policy limits demand to your client."  (Doc. 1-7 at 2).   Again,  in this  letter, Potter advised Walker of the potential excess liability, his

---

[23]  Walker stated in her deposition, "I think she wanted her day in court. When it's all said and done I think she wanted her day in court. That was her right."  (Doc. 109-1 at 34(133)). Walker believed that it was best for Murphree to go to trial if Murphree wanted to go to trial. (Doc. 109-1 at 41(164)-42(165)).

intent to collect an excess judgment from her client, and his assumption that Walker had advised Murphree of his letter of January 29th and his policy limits demand.   (Doc. 1-7 at 2).

In a January 30, 2013, email Walker told Lyon that "things are going from bad to worse" and informed Alfa that Murphree had been arrested for theft of property and now had drug and theft charges. (Doc. 103-6 at 5). The email also stated: "If either of these charges are crimes of moral turpitude, which I think the drug charge may be, I will probably not be able to keep this evidence out, and I don't think we will win, [p]lus, I don't think I can rely on her at trial." (Doc. 103-6 at 5).[24]   Walker did not recommend that Alfa settle the case.

In a February 14, 2013, email, Walker gave Lyon an update on Murphree, and stated that Walker had filed a motion to continue the case.   (Doc. 103-6 at 9).   Walker also wrote:

> Plaintiff filed a strenuous objection. The judge has not ruled yet, and I have a feeling he may delay a ruling hoping the case will settle. Ultimately, I do not think he will force us to trial. I think it is going to be difficult, if not impossible, for me to talk to her, but I will try to write her. I do not want to be forced into a settlement, because her latest problems have no bearing on the accident that occurred three years ago. Please let me know your thoughts.

---

[24]   The defendants dispute this fact, stating that the phrase "I don't think we will win" referred to the issue of whether Walker could keep out the arrest evidence.  (Doc. 130 at 7). Nothing about the email indicates that that was what Walker was referring to.  The email speaks for itself.

(Doc. 103-6 at 9).

### 16. *Walker Meets with Murphree to Discuss Excess Verdict Possibility*

While Murphree was in jail, Walker met with her for trial preparation. Walker discussed with Murphree the option to file for bankruptcy if there was an excess verdict. Wagner was at that meeting and testified that Walker told Murphree that Murphree could still request to settle if she wanted to. (Doc. 110-1 at 4(12)).

In a February 20, 2013, letter, Walker advised Lyon that Walker had spent two hours meeting with Murphree in jail.   (Doc. 111-9 at 7).   Walker wrote that, although there were no drug-related charges, Murphree had admitted to using crack cocaine prior to her arrest. Walker told Lyon that she "again discussed [with Murphree] at length the issues in the case, including the possibility of an excess verdict."   (Doc. 111-9 at 7). Walker stated that she "again discussed the pros and cons," "again reminded [Murphree] that she can have her own attorney . . . and has the right to demand that Alfa settle the case." (Doc. 111-9 at 7).   Walker states that she explained to Murphree that any demand she had that Alfa settle the case would be relayed to Alfa by Walker.   (Doc. 111-9 at 7). Walker states in the letter that, after due consideration, Murphree stated that she wanted to proceed with trial. (Doc. 111-9 at 7).

Eventually, the February 25th trial date was continued to April 29, 2013.

### 17.   *The Trial*

Trial began on April 29, 2013. At trial, the attorneys for Cameron and Murphree stipulated that the medical bills had been paid by collateral sources.   Evidence was introduced that Cameron owed $4,568.51 to Blue Cross Blue Shield and $31,797.68 to Medicare for a total of $36,366.19 in actual expenses.

An April 30, 2013, email from Walker to Lyon stated: "[T]hink things are going well. Pleased with jury, tore their 'eye' witnesses to shreds on cross. Evidentiary rulings OK, except police officer will be allowed to say that our witness changed her story, but I'll let you know how his cross goes this afternoon." (Doc. 103-6 at 13).

At one point during Murphree's testimony at trial, she testified that she hit Cameron "probably eight to 10 seconds" after she saw her enter the intersection. (Doc. 103-9 at 30(426)).   However, her trial testimony before that was that she did not have time to honk her horn before she hit Cameron "[b]ecause as soon as I saw her, within like three seconds I hit her." (Doc. 103-9 at 30(426)).   Murphree also testified, "It might not have been three seconds, but it wasn't -- it was very short -- a very short period of time." (Doc. 103-9 at 30(426)).   Murphree also testified, "I can't tell you exactly how long it was. But, I mean, as soon as I saw her we hit -- I had enough time to hit the brakes a little bit, and we hit her." (Doc. 103-10 at 1(430)).

In a later email to Lyon sent that same day, Walker stated:

Plaintiff attys [sic] have realized that they have a problem with their witnesses, so now they have new theories. One is that Ashley saw Ms. Cameron in time to stop, even if she did have the green light. . . . I cautioned Ashley to not testify that she saw Ms. Cameron before the accident. However, she ignored me and stated she saw Ms. Cameron's vehicle 8 seconds before the collision and started breaking [sic] quite a distance back. This was something she never told me and did not testify to in her deposition. Obviously, they are trying to establish that Ashley had the last clear chance to avoid the accident, and failed to do so, which would negate Ms. Cameron's contributory negligence. I think judge will allow a jury charge on this, but I don't get any really negative feelings about the jury, although you can never tell.

(Doc. 103-6 at 15).[25]

Regarding the charge conference, Walker testified:

Q.      And then my recollection at the charge conference is the same as yours, he didn't charge on contributory negligence at all; correct?

A.      No, I asked him to but he refused.

Q.      Right.

---

[25]   As noted above, Murphree told Alfa, during its initial investigation, that she (Murphree) saw Cameron before the accident. *See* Section IV.B.2. *supra*, regarding Murphree's statements to Alfa claims adjuster Robbie Elrod. Yet Walker, in this email, tells Lyon that she "cautioned Ashley [Murphree] to not testify that she saw Ms. Cameron before the accident. However, she ignored me and stated she saw Ms.Cameron's vehicle 8 seconds before the collision and started breaking [sic] quite a distance back. This was something she never told me and did not testify to in her deposition." (Doc. 103-6 at 15).  The court wonders how Walker could have known to "caution Ashley not to testify" to specific facts if Walker had no prior knowledge that Murphree would testify to those facts. Nonetheless, assuming that Walker did not know about or had forgotten those statements by Murphree to Alfa's investigator, that calls into question Walker's trial preparation, since this testimony was very damaging to Murphree in Walker's opinion. However, as noted in Section IV.C.6. *infra*, the plaintiff has expressly disclaimed any claim of malpractice relating to Walker's trial preparation or manner of trying the Underlying Action, so the court will not comment further.

A.     It was his rationale that it was who had the green light.

Q.     Right. Did you agree with that reasoning?

A.     To some extent I did, and I did not argue with him really because I didn't want the last clear chance to come in, so I thought the judge actually made a good ruling so I didn't object.

(Doc. 109-1 at 20(80)).

During closing arguments, Cameron's attorney's told the jury: "[I]f you add up the medical expenses, the pain and suffering, mental anguish, permanent injuries and out-of-pocket losses, the total is $670,930.62."     (Doc. 103-12 at 6(773)).   He told them that they could give her more or less than that, based on their judgment.   *Id.*   On May 1, 2013, Walker reported to Lyon that she did not get the impression that the jury wanted to award a large verdict.

On May 3, 2013, the jury rendered a verdict in the amount of $260,000.00 for Cameron and against Murphree. In a May 3, 2013, email, Walker told Lyon:

> I spoke with several jurors after trial. Two of the male jurors were most helpful and discussed this with me at length, They said that they did not find any of the witnesses to be credible, even the police officer, so they threw all that testimony out. They decided the case on the photographs and who they thought was most credible, Cameron or Ashley. Unfortunately, they did not think Ashley was credible…. The jurors told me that they did not think there was anything I could have done to make her act better. I spoke with Judge Millican. He said that he did not think I could have done anything any better.

(Doc. 103-6 at 19).  In this same email Walker wrote:

> I sent numerous letters to Ms. Murphree about the possibility of an excess verdict. You did, also. Stephanie and I sat down with her and told her that all she had to do was tell us she wanted ALFA to settle and we would let ALFA know. She never made a demand that we settle.

(Doc. 103-6 at 19).   She went on to inform Lyon that Murphree may have a potential negligent failure to settle claim against Alfa arising out of the verdict:   "The worst that can happen is that she finds an attorney who will file a negligent failure to settle but we have numerous defenses…."   (Doc. 103-6 at 19).   It is undisputed that the "we" in "we have numerous defenses," referenced Walker and Alfa.

At the time the jury rendered its verdict, Murphree was not in the courtroom as she had decided to stay in jail.   Walker never visited, spoke to, or wrote to Murphree after the verdict.   Instead, Walker sent her daughter and associate Wagner (who had been a licensed attorney for only eight months), to speak with Murphree.   Wagner had virtually no involvement in the case prior to this point.   Despite knowing that Murphree had potential extra contractual claims against Alfa, Walker did not explain the possibility of such claims to Wagner before sending Wagner to speak with Murphree the day of the verdict. Walker did not explain any grounds for appeal of the verdict to Wagner before sending Wagner to speak to Murphree.   When Wagner met with Murphree the day of the verdict, Wagner did not inform Murphree of the fact that Murphree had potential extra-contractual claims (negligent failure to settle and/or bad faith failure to settle), because Wagner did not even know those causes of action existed.

Wagner testified that, at that initial meeting, she "let [Murphree] know her options included, I mean, she could request to file an appeal." (Doc. 110-1 at 8(26)). Wagner testified:

> She didn't want to do that because she wanted it -- I mean she wanted this over. She was hoping this would sort of coincide with her getting out of her program and just be able to start fresh.
>
> She was not interested in filing an appeal. So we spoke about bankruptcy that day. She said that was definitely something she wanted to look into.

(Doc. 110-1 at 8(26)).[26]  The following exchange took place in Wagner's deposition:

> Q.    When y'all discussed the appeal did you discuss any particular grounds for appeal?

---

[26]  The following exchange took place in Wagner's deposition:

Q.    Prior to the day of the verdict, that meeting, did you, absent your mom, these times when it was just you and her did you ever have any conversations with Ashley about bankruptcy, negligent failure to settle, bad faith failure to settle, anything that would happen post verdict?

MR. GRAY: Object to the form.

A.    She asked me a couple of questions about bankruptcy. You know, we had talked about that that first meeting, it had come up as sort of a worst case scenario if you get a judgment.

I mean I felt like I could talk to her about that because I worked for the trustee for two and a half years.

I had processed hundreds of bankruptcy petitions, so I felt qualified to talk to her about if I were in her situation and I got a judgment against me, I would have filed bankruptcy.

(Doc. 110-1 at 7(21-22)).

A.      No, I didn't talk about anything. I just let her know that was -- I mean if a judgment comes back against you, that's one of your options, and she wasn't interested in that.

(Doc. 110-1 at 8(27)).

Based upon the legal advice given her, Murphree told Wagner that she wished to pursue bankruptcy, but expressed concerns about whether she could afford to do so. When asked if there was any discussion that day about Alfa paying for it, Wagner testified: "Oh, no, no. I didn't – I mean – there wouldn't have been any mention of that. That wasn't even, you know, on the table."  (Doc. 110-1 at 9(29)).  Instead, in an email to Burgess dated May 4, 2013, Walker told Burgess: "I think Ashley can get a discharge in bankruptcy. . . . I may be able to get [A]lfa to pay the bankruptcy fees."  (Doc. 109-7 at 30).

### 18.   *Murphree's Bankruptcy Filing*

In his affidavit, Lyon states:

[O]n or about May 13, 2013, Walker called me and told me that she had met with Murphree and that Murphree had requested that Alfa help pay for her to file for bankruptcy.  I then consulted with [an attorney] about whether such a payment was lawful. [The attorney] advised that it was lawful, so long as it was done at Murphree's request and was done voluntarily.  He also advised that her request should be made in writing.  I then called Walker back, and Walker stated that the decision to file for bankruptcy was from Murphree and had not been forced in any way.  Morever, the request for assistance in filing had come from Murphree. . . .  I asked Walker to get something in writing so that I could consider the request.

[]Walker then sent me an email on or about May 13, 2013,[27] stating that Murphree did want to file a Chapter 7 bankruptcy petition and that Murphree had requested that Alfa assist her in paying for the bankruptcy attorney's fees.   Walker reported that she had discusse[d] the benefits and disadvantages of such a filing, including the negative impact on her credit rating.   Walker included a copy of Murphree's signed request, which incorporated a covenant not to sue.

(Doc. 103-1 at 13).

Walker drafted the Covenant Not To Sue.   (Doc. 109-1 at 56(221)).   Walker testified that this document was not drafted until Alfa "let [Walker] know that ALFA would help with the bankruptcy filing and asked me to draw something up." (Doc. 109-1 at 56(223)). The Covenant Not To Sue provided:

I, Ashley Murphree, understand that a verdict and judgment against me has been obtained by Willow Cameron that is in excess of my policy limits with ALFA. I was aware before trial of this possibility and had discussed this with my attorney on several occasions. My attorney advised me on more than one occasion that I could demand that ALFA pay policy limits to the plaintiff before trial, but I knew that I had the green light and did not run any red light and I knew that there was an eyewitness who would testify that it was Ms. Cameron who ran the light, so I wanted to proceed to trial.

Since the verdict, I have discussed my options with my attorney.

---

[27]  The email stated that Murphree asked Walker to ask Alfa

whether ALFA will pay her bankruptcy attorney's fees which will be $1200. We have discussed with her the benefits of such a filing as well as the disadvantages. which would primarily be the negative impact on her credit rating for a period of time. Attached is her request. which incorporates a covenant not to sue. If ALFA agrees, please let me know how I should handle payment of the bankruptcy fee.

(Doc. 103-6 at 22).

Since my only asset is my vehicle, and since I have other debts, and no income at present, I would like to file a Chapter 7 bankruptcy petition. I am requesting that ALFA help me with the bankruptcy fees, which I understand would be approximately $1200. I understand that, by filing for bankruptcy, my credit rating would be damaged for a period of time, but by filing a Chapter 7 petition, I could discharge the excess amount of the verdict, and also discharge other debts that I have. I also understand that there is a very good chance that the bankruptcy judge will allow me to keep my vehicle, which is my only asset. I think it would be in my best interests to file a Chapter 7 petition. My attorney has advised that she will assist me in finding a bankruptcy attorney, and will help in whatever way she can with the filing, but she has not pressured me in anyway to file for bankruptcy.

I do not feel pressured by ALFA or my attorney to file for bankruptcy. It is my voluntary decision. I would be grateful if ALFA would assist me in paying the bankruptcy fees. In consideration for this assistance, I agree that I will not institute, prosecute or in any way aid in the institution or prosecution of any claim, demand, action or cause of action for damages or costs resulting or arising from the verdict or from any bankruptcy action.

(Doc. 1-8 at 2).[28]

Walker testified: "I just asked her [Wagner] if she would take it, to go over it thoroughly with Ashley and to see if Ashley agreed with it and to see if Ashley would sign it. There was [sic] no other instructions that I recall."   (Doc. 109-1 at 59 at 59(236)). Walker stated that the release  "wasn't presented as she had to sign it.  It was a request

---

[28]  Walker proffers the following fact:

22.    Murphree requested assistance with respect to filing a bankruptcy petition. Her intentions in this respect, are set forth in a document which Murphree signed. Ex. C:429 ("Request for Assistance in Filing for Bankruptcy and Covenant Not To Sue").

(Doc. 107 at 16).  The document speaks for itself.  This fact will not be included.

would she sign it." (Doc. 109-1 at 56(221)). Wagner testified that, "[t]he only things that I can specifically remember discussing [with Walker] was just that ALFA had agreed to pay for the bankruptcy and that this was the document that Ashley could look at and decide if she wanted to sign if she wanted them to pay for it." (Doc. 110-1 at 9(30)). Wagner met with Murphree, in jail, at some point and Murphree signed the document. (Doc. 109-1 at 54(215), 56(224)-57(225)). [29]

No post-verdict motions were filed in the underlying action on Murphree's behalf. No appeal was taken on Murphree's behalf. No post-verdict offers of settlement were made on Murphree's behalf.

### 19.   *The Bankruptcy*

Alfa paid for attorney Tameria Driskill to represent Murphree in her bankruptcy petition. The plaintiff has no criticisms of Driskill's handling of Murphree's bankruptcy petition.

On May 24, 2013, Driskill filed a Chapter 7 bankruptcy Petition for Murphree in the U.S. Bankruptcy Court, Northern District of Alabama, Eastern Division, bearing case number 13-41009-JJR7. As noted previously, none of the proceeds utilized to cover the bankruptcy (fees and costs) were paid to or through Murphree. Instead, they were paid

---

[29]  It is undisputed that at the time Walker sent Wagner to get the release signed by Murphree, Wagner's understanding was that Murphree was only releasing any potential claims for "malpractice" against Wagner, Walker, and Alfa in exchange for paying for Murphree's bankruptcy. (Doc.110-1 at 9(31-32)).

by defendant Alfa.[30]

Leo testified with regard to the bankruptcy petition. He acknowledged that the petition shows that, before Murphree was allowed to file her bankruptcy petition, she was fully advised of the nature of the bankruptcy proceeding, including being advised of the negative long-term consequences which are attendant with bankruptcy. Leo also acknowledged that the petition shows that, in filing the bankruptcy petition, it was incumbent on Driskell to perform an independent review and assessment of Murphree's assets, and to report all such assets in the petition. The following exchange also took place in Leo's deposition:

> Q.     Okay. Is there a place on the bankruptcy petition where a petitioner can list and disclose claims that they might have against somebody, even if they haven't filed the lawsuit yet?
>
> A.     Yes.
>
> Q.     Okay. So if a pedestrian had been hit by a car in a crosswalk and they knew they had a lawsuit against Joe's Fish Fry for driving the truck, they could list I have a claim for my personal injuries against Joe's Fish Fry but I've not filed a lawsuit?
>
> A.     Yes.
>
> Q.     They could do that?
>
> A.     Yes.

---

[30] Pursuant to the Bankruptcy Rules, Driskill filed the "Disclosure of Compensation of Attorney for Debtor" form that verified that the source of her compensation was Alfa. (Doc. 113-1 at 49).

(Doc. 113-1 at 14(52)-15(53)).   In his deposition, Leo also acknowledged that, as to Murphree's bankruptcy, there were no such claims listed on the petition.   (Doc. 113-1 at 15(55-56)).

On May 17, 2013, Alfa wrote a check to Mann & Potter, P.C. & Willow Cameron in the amount of $100,000.00, representing the full amount of bodily injury policy limits available for Murphree's insurance claim. (Doc. 103-1 at 14, ¶ 47).   The check has never been cashed, deposited, or otherwise negotiated.   Despite Mann & Potter, P.C. being in receipt of the $100,000 partial satisfaction of Murphree's debt, Mann & Potter, P.C. filed a creditor's claim for the full $260,000 verdict for Cameron.   Ted Mann listed himself as assignee for Cameron's $260,000 creditor's claim.

Leo was unaware of the $100,000 payment by Alfa until "two or three weeks" before his June 29, 2015, deposition. Leo never spoke to Murphree about what was her motivation for signing the Covenant Not To Sue or to determine whether anyone spoke to Murphree to advise her of her rights regarding the Covenant Not To Sue. Leo never spoke with Murphree about whether she had been adequately informed of the risks of going to trial or whether she had been adequately informed of her rights with regard to settlement. Leo never even spoke to Murphree at all to determine whether she might substantiate the allegations of the Complaint, including the damages allegations.

20.    *Walker's Conversations With Murphree*

a.    **Assessment of the Case**

In Walker's deposition, the following exchange took place:

Q.    Did you feel like your assessments of the case of its strengths and weaknesses that you relayed to Ashley did you feel like they were honest and objective?

A.    Yes.

(Doc. 109-1 at 36(142)).   Walker testified that there were "several meetings" where she "explained to [Murphree] the risks of excess verdict and what that meant, that her assets could be at risk, whatever assets she had." (Doc. 109-1 at 31(123)).   The following are just a few examples of such testimony from Walker's deposition:

– Walker testified that she "told her that I would do whatever she wanted to do, but we did talk about -- we talked about excess verdicts. We talked about the injuries. We talked about the dangers. I told her there was a chance that jurors wouldn't like her." (Doc. 109-1 at 28(112)-29(113)).

– Walker testified that she and Murphree also discussed the legal doctrines of subsequent negligence and wantonness several times. (Doc. 109-1 at 21 (81-82)).

– Walker testified that she "specifically told [Murphree], you know, feel free if you want to get an attorney to talk to you about what your recourse would be if there is an excess verdict. You know, feel free to do that." (Doc. 109-1 at

32(125)).

– Walker testified:

Q.     Did you discuss with Ashley Murphree what her excess exposure might be? Did you discuss potential ranges with her?

A.     Yes. We talked about the amount of medicals. I explained to her about the collateral source, that we could show there was collateral source. They could come back and show there was a subrogation interest. They could also get into evidence what Ms. Cameron paid for her insurance, her health insurance. We discussed all that. We discussed the fact that there was not a limitation on what the jury could award. That they could award the medicals, less than the medicals, some number times the medicals, some number times the subrogation amount. They could award punitives if the wantonness claim was not thrown out; that it could be a range. We discussed that.

(Doc. 109-1 at 30(118-119)).

– Walker testified that Murphree told her that she understood the risk of an excess verdict. (Doc. 109-1 at 23(92)).

–  Walker testified that, in her conversations with Murphree, Walker "repeatedly" told Murphree that if Murphree wanted to settle, all Murphree needed to do was to tell her.  (Doc. 109-1 at 32(128)).[31]

### b.     Settlement

It is undisputed that Walker never advised either Murphree or Alfa to settle the case.  However, Walker testified that she "made sure that she [Murphree] knew all the

---

[31]  Wagner also testified that Walker advised Murphree that she could request the case be settled if she wanted to. (Doc. 110-1 at 4(12)).

risks . . . I don't think I specifically said settle, but I gave her every opportunity to tell me

if she wanted to." (Doc. 109-1 at 29(114)).  As to that issue, Walker testified:

> Q.     Okay. We're going to go through the letters here in a minute, and
> we'll go through them, but do you remember writing anything -- do you
> remember anything in writing to Ashley saying if you ask ALFA to settle
> the case, they will?

> MR. GRAY: Object to the form.

> A.     I don't think I ever -- I don't know if I put that in writing or not.

> Q.     (By Mr. Bruner) Okay.

> A.     I asked her to -- certainly asked her to let me know, and when we
> talked I said -- when we talked I pretty much did everything but get down on
> my knees to ask her if she wanted to settle because it certainly would have
> been easier for me to have settled the case. I said Ashley, it will not make
> me feel any less of you if you ask me or tell me you want to settle. I said
> I will go to ALFA. I will let them know that. All you have to do is say the
> words. And she was very thoughtful about it. She, she sat and she thought
> about it and I said Ashley, you tell me what you want to do. Don't base your
> decision on what you think anybody else wants you to do. You tell me what
> you want to do. If you want to settle, all you have to do is tell me and I'll
> tell ALFA. I don't know how I can be any plainer than that to you about what
> I said to Ashley and what Ashley said to me.

> Q.     Was this a specific conversation you're thinking of, or is this
> something that a conversation that you had with her a number of times?

> A.     We had it a number of times, but in particular when we were sitting
> at the county jail together I think it was the time Stephanie was with me
> also, we had a very long discussion. We went through everything. Ashley
> told me -- I'm sorry. I can still see Ashley. I'm devastated that she died. I'm
> sorry.

> Q.     Do you want to take a minute?

A.      No. Ashley told me she was in the SAP Program. She voluntarily entered it according to Judge Russell. She told me that she had renewed her faith, that she had been baptized, that she wanted to get her life together. She wanted to finish the SAP Program. She was hoping for probation on the criminal charges. She told me she wanted to get her life together, that she wanted to get out of jail. She wanted to see her -- see, she didn't get to see her daughter the whole time she was in the SAP Program. She told me she wanted to get out of jail. She wanted to get the litigation behind her. She wanted to take care of her daughter. She wanted to put all of this behind her, and I admired her for that. And I said Ashley, if you don't want to go through trial you don't have to. I said all you have to do is tell me if you want to settle this case. I won't think any less of you. I don't care what anybody else wants to do. You tell me what you want to do. And she thought about it. She sat there and she looked at me and she thought about it. We talked about, of course, adverse consequences, but to the best of my knowledge she understood that if she told me she wanted to settle, I would go to ALFA and I would tell them she wanted to settle. And I know from my perspective it would have been much easier for me to settle the case because she wouldn't have had to go through a trial. I think Ashley wanted somebody to believe in her, and I believed in her and to this day I still do. I am so devastated that she died. I don't know what happened to cause her death. I heard it was something to do with drugs, but all I can tell you is that. I don't have all of that in writing. I mean we can go through everything in you want to. I'm just telling you that is what happened. And I can't say anything else.

(Doc. 109-1 at 26(103)-27(107)).

Elsewhere in Walker's deposition, the following exchange took place:

Q.      (By Mr. Bruner) Recommend. Did you in that meeting or at any other time say to Ashley I think you need to settle this case, I think it would be in your best interest to settle this case.

A.      I -- no. I told her I said, Ashley, if there is any doubt whatsoever about who had the light or who had the right-of-way, tell me now. And she thought about it. And she said no. She said I had the light. And she said I'm sure I had the light. And I just said are you sure, because certainly she has

the right to go to trial. That's her right, and so I didn't argue with her. I think that she wanted somebody to believe in her, and I did. And I just made sure that she knew all the risks but, no, I don't think I specifically said settle, but I gave her every opportunity to tell me if she wanted to.

(Doc. 109-1 at 29(113-114). Walker further testified:

> Q.      (By Mr. Bruner) You didn't see from where you were sitting advising your client a downside for Ashley to settling the case or for ALFA settling the case?
>
> A.      I did not and that's why I kept repeatedly telling her if she wanted to settle, all she had to do was tell me.
>
> Q.      But you didn't recommend that she do that?
>
> MR. GRAY: Object to the form.
>
> A.      I don't -- I think it was her decision to make, not mine.

(Doc. 109-1 at 32(128)).  Walker further testified:

> Q.      You would agree with me, wouldn't you, that even if a case is very thin liability, that if the damages are -- potential damages are way in excess of coverage, that may still be a case you have to settle for policy limits if you can?
>
> MR. GRAY: Object to the form.
>
> A.      Well, I can't agree to that when my client is specifically saying she wants to go to trial.
>
> Q.      (By Mr. Bruner) Take that part of it out of the equation.
>
> A.      Well, I can't take that out because in this case Ashley said I want to go trial.
>
> Q.      And you thought it was best for her to go to trial?

A.      Yes, if that's what she wanted to do.

Q.      You had no qualms about her taking that risk?

A.      It's not a matter of my qualms. It's a matter of I have given her an honest assessment of the strengths and weaknesses of the case on many occasions. I have given her every opportunity to tell me she wants to settle. And when she says to me I want to go to trial, I didn't run the light, I have a witness who backs me up, then I have to do what my client wants to do.

(Doc. 109-1 at 41(163)-42(165)).

### c.      Potential Claims Against Walker, Wagner, and Alfa

Walker testified:

Q.      (By Mr. Bruner) Did you ever advise her of potential claims she might bring against ALFA?

A.      No, she never asked me about claims and I never had any indication that she was interested in any claims. She never made any complaint to me about myself or ALFA or Stephanie. And based on everything that I had done and that I knew ALFA had done I didn't think there were any claims.

(Doc. 109-1 at 53(211-212)).[32]

---

[32]  This fact, proffered by Walker, originally included the following: "Defendants Walker and Wagner testified to several conversations with Murphree, including conversations with Murphree specifically discussing the fact that someone might try to stir up claims for bad faith or malpractice. Yet, even with these specific possible claims being discussed, Murphree never expressed any dissatisfaction with Defendants Walker or Wagner."  (Doc. 107 at 15).  There is no citation to the record supporting this statement, and it has been disputed by Leo.  (Doc. 122 at 5).  This fact will not be included.

C.        **Analysis**

    1.        *Count One – Voiding the Covenant Not To Sue as a Fraudulent Transfer*

"A bankruptcy trustee stands in the shoes of the debtor and has standing to bring any suit that the debtor could have instituted had [she] not been thrown into bankruptcy." *O'Halloran v. First Union Nat. Bank of Florida*, 350 F.3d 1197, 1202 (11th Cir. 2003) (citing 11 U.S.C. §§ 541–42).   Any defenses a defendant might have against the debtor would also apply to the trustee.  *See*, *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006) (" [T]here is no suggestion in the text of the Bankruptcy Code that the trustee acquires rights and interests greater than those of the debtor. . . . If a claim . . . would have been subject to [a] defense . . . at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.").   The defendants assert that the Covenant Not To Sue is an affirmative defense entitling them to summary judgment on all of the plaintiff's claims.

In Count One, Leo seeks to void  the Covenant Not To Sue as a fraudulent transfer under the bankruptcy code.  (Doc. 96 at 31).  The code provides:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . ., that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily–
>
> . . .

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C.A. § 548.  The parties do not generally dispute the applicability of this section of the code.  The only issue in this case is whether Murphree ("the debtor") "received less than a reasonably equivalent value in exchange for" agreeing not to sue the defendants.

Judge Propst, to whom this case was previously assigned, dealt with this issue in the context of the Walker's (and dismissed defendant Wagner's) motion to dismiss. Judge Propst wrote:

> [The defendants] contend that the transfer was, as a matter of law, for reasonably equivalent value. . . .
>
> In a bankruptcy proceeding, "state law defines the scope and existence of [a] property interest." *In re Schweizer*, 399 Fed. App'x 482, 484 (11th Cir.2010) (*citing In re Sinnreich*, 391 F.3d 1295, 1297 (11th Cir.2004) (*citing Butner v. United States*, 440 U.S. 48, 55 (1979))). In Alabama, a release acts to extinguish a party's "cognizable claim[s]." *Ex parte Renovations Unlimited, LLC*, 59 So.3d 679, 683 (Ala.2010). Based on this, the individual defendants analogize the effect of the Covenant Not to Sue to an entry of judgment. (Doc. 18 pg. 13). The Fifth Circuit has held that a state court's entry of judgment "conclusively established that the Debtors' claims ... had no merit." *Matter of Besing*, 981 F.2d 1488, 1496 (5th Cir.1993). Thus, the claims were worthless, and "the Texas court's disposition of the Debtors' claims constituted a transfer for reasonably equivalent value as a matter of law." *Id.* The defendants contend that the same reasoning should apply to a release under Alabama law.

The individual defendants' attempt to liken an entry of judgment to a contractual release is unpersuasive. They overlook the Fifth Circuit's statement that "[w]e emphasize that our decision addresses only the disposition of state law claims *by a state tribunal*." *Id.* (emphasis added). The court stated "under law, the dismissal constituted an adjudication *on the merits* of the Debtors' claims." *Id.* at 1495 (emphasis added). "The Bankruptcy Code was not intended to give litigants a second chance to challenge a state court judgment nor did it intend for the Bankruptcy Court to serve as an appellate court [for state court proceedings]." *Id.* at 1496 (*quoting In re G & R Mfg. Co.*, 91 B.R. 991, 994 (Bankr.M.D.Fla.1988)). Because of this concern for second guessing a state judiciary, the court "decline[d] the Debtors' invitation to 'look behind' the state court judgment and make an independent evaluation of the claims." *Id.*

Avoiding a contractual release, on the other hand, does not require the court to "look behind" a state tribunal. No state court has addressed the merit of the plaintiff's claims against the individual defendants, let alone found them to be worthless. Rather, the individual defendants themselves addressed the value of the plaintiff's claims. According to the individual defendants, because of their conclusion, the value of the plaintiff's claims, as a matter of law, was "zero." (Doc. 18 pg. 14). They argue, in effect, for the court to give res judicata effect to their own determination of the viability of the plaintiff's claims. This court declines to give the individual defendants the same deference due a state tribunal.

After *Busing*[33], courts have implicitly reached similar conclusions. *See In re e2 Commc'ns, Inc.*, 320 B.R. 849 (Bankr.N.D.Tex.2004); *In re NuMed Home Health Care, Inc.*, 326 B.R. 859, 867 (Bankr.M.D.Fla.2005). After relying on *Busing*[34] to find that the release of a claim was a transfer under § 548, the *Communications, Inc.* court stated "what is relevant to a fraudulent transfer claim is ... how much value the Debtor received in exchange for the property transferred (did the Debtor receive reasonably equivalent value in exchange for the property transferred?)." 320 B.R. at 858. In denying summary judgment, the court

---

[33]  *Sic.*

[34]  *Sic.*

did not assume that any contractual release between two parties must necessarily be for reasonably equivalent value. Instead, it found "a genuine issue of material fact exists as to whether [releases in] the CRA transaction [are] avoidable." *Id.* at 859.

> The court disagrees with the individual defendants' assertion that they acquired the Covenant Not to Sue with reasonably equivalent value as a matter of law. Rather, whether the claims were transferred for reasonably equivalent value is "largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts." *In re Chase & Sanborn Corp.*, 904 F .2d 588, 593–94 (11th Cir.1990) (internal citations omitted).

*Leo v. Alfa Mut. Ins. Co.*, No. 1:13-CV-01826-RBP, 2013 WL 6490226, at *4-5 (N.D. Ala. Dec. 10, 2013) (bracketed alterations in original) (emphasis by underlining added).

The plaintiff argues that Judge Propst's decision, particularly the underlined section above, precludes entry of summary judgment in favor of this claim. (Doc. 123 at 24-25). This court agrees because it agrees with the reasoning and conclusion of that decision: the trier of fact should decide whether Murphree's claims were transferred for reasonable value.[35]

Alfa notes that Count One "is premised on the notion that a transfer of assets occurred between Alfa and Murphree that was unequal, *i.e.* that the $1,200 bankruptcy filing fee was less than a reasonably equivalent value of Murphree's potential claims against Alfa and her attorneys." (Doc. 104 at 40). Alfa argues that "there is no viable

---

[35] Judge Propst was addressing Walker and Wagner's motion to dismiss. The logic applies equally to Alfa's argument on this issue (*see* doc. 104 at 40-42), which has been adopted by Walker in her motion for summary judgment (*see* doc. 107 at 22).

claim as a result of the verdict [in the underlying case]" (doc. 104 at 41); "Murphree did not have a valuable claim against Alfa that she was releasing" (doc. 104 at 41); and that Alfa "is entitled to summary judgment on Count [One] for the same reasons [that] it is entitled to summary judgment on Counts [Two] through [Five].  There is no viable cause of action for negligent or bad faith failure to settle."  (Doc. 104 at 42).  In other words, Alfa argues that if dismissal is appropriate on the other counts, then those claims are worthless, and any value given by the defendants for the release of those counts was reasonable as a matter of law.  (*See* doc. 104 at 26 ("The . . . claim to void a fraudulent transfer . . . fail[s] because [it is] contingent on the viability of other causes of action.")).  Walker adopts Alfa's position as to the claim against her. (Doc. 107 at 22).  The plaintiff, of course, argues that "this argument fails in light of [p]laintiff's proper showing that summary judgment is due to be denied." (Doc. 123 at 26).

This argument requires the court to first examine the merits of all of the other counts in the Second Amended Complaint.  Because of how the defendants have framed their argument regarding Count One (*i.e.* the claims released by the Covenant Not To Sue are worthless only because they have no merit), if any of the other counts survive summary judgment, the court will deny summary judgment on this count as well.[36]  Because, as set out below, at least one of the other claims in this case survives, summary

---

[36]  The defendants have presented no evidence or argument as to the value of any claims that might survive.

judgment will be denied as to Count One.[37]

> ### 2.     Counts Two and Three–Negligent/Wanton/Bad Faith Failure To Investigate and Settle

> > #### a.     The Fact that Murphree Wanted To Proceed to Trial Is Not an absolute Bar to Claims against Alfa of Negligent, Wanton, and Bad Faith Failure To Settle[38]

Alfa cites several non-binding cases which it says stand for the proposition that "if an insured requests that the insurance company not enter into a settlement, and the company accedes to that request, the insurer cannot be held liable for any excess judgment." (Doc. 104 at 26-27; *see also*, doc. 104 at 27-31 (*citing and discussing Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 80 (3d Cir.1985) ("When the decision to try, rather than settle, a personal injury suit is approved by the insured, neither it nor the excess insurer may recover from the primary carrier when the verdict exceeds the primary policy limits."); *Eklund v. Safeco Ins. Co.*, 579 P.2d 1185, 1186 (Colo. App. 1978) ("[H]ere it is undisputed that the [insured] demanded that [the insurer]

---

[37] Leo argues in his response brief that the Covenant Not To Sue was procured fraudulently, apparently in an attempt to argue that it should be void for that reason as well. (Doc. 123 at 26-27). However, since Leo has not moved for summary judgment on this issue, and since the court has found that the defendants are not entitled to summary judgment as to Count One, the court will not address this argument.

[38] The court notes that Alfa incorrectly states that "[t]he gravamen of [p]laintiff's complaint is that Alfa acted negligently, wantonly, and/or in bad faith by withholding Cameron's settlement demands from Murphree, thereby preventing Murphree from making an informed decision as to whether she should settle[.]" (Doc. 104 at 26). Even a cursory review of the Second Amended Complaint reflects that Leo complains of much more than that.

not settle the claim upon any terms even though claimant's two offers of settlement were within the policy limits. The trustee stands in the same position as the bankrupt . . . and thus he cannot now complain that [the insurer] should be liable for the excess because a settlement was not effected."); *Peterson v. American Family Mut. Ins. Co.*, 160 N.W.2d 541, 544 (Minn. 1968) ("In the absence of any probative evidence that the insurer misled [the insured] with respect to his vulnerability, it is clear that it was his voluntary and considered decision to try the case. Under these circumstances, it can hardly be claimed that his insurer is liable to him for not having insisted upon a settlement within the policy limits."); *Jackson v. St. Paul–Mercury Indem. Co.*, 339 F.2d 40, 44 (6th Cir.1965) ("[I]f the insured actively concurs in the rejection of a compromise offer, he cannot recover against the insurer for failure to settle.")). However, Alfa has cited no Alabama case, and this court has found none, for this same proposition. Further, Alfa fails to explain why this court should assume that the Alabama Supreme Court would follow this approach.[39]  On the contrary, it seems settled that the Alabama Supreme Court would find the plaintiff's decision to try the case would be merely one factor in the "totality of the circumstances" for the court to consider.

---

[39]  The parties' briefs treat negligent and bad faith refusal to settle together, which is unfortunate because the two concepts are distinct.  In *Waters v. Am. Cas. Co. of Reading, Pa.*, 261 Ala. 252, 256-58, 73 So. 2d 524, 528 (1953), the Alabama Supreme Court wrote that the two claims "constitute different concepts. They may be joined in separate counts in a suit, and either may exist without the other."  *Waters*, 73 So. 2d at 529.  "[I]t is a question for the jury from all the facts and circumstances to determine whether the failure on the part of the insurer to make settlement is an act of negligence or one of bad faith."  *Id.*

Judge Watkins, from the Middle District of Alabama, recently explained this aspect of Alabama law.

NGAC[, the insurer,] contends that, to prevail on her third-party bad-faith claim, Ms. Franklin[, the insured,]  must show the absence of an arguable or debatable reason for its pre-suit refusal to settle . . . for the policy limits ("arguable reason" test). According to NGAC, a "genuine liability dispute" existed based upon Ms. Franklin's persistent denial of fault and the police report that placed the fault on Mr. S Gutierrez. NGAC further contends that the existence of a genuine liability dispute provides an arguable reason sufficient to refuse a policy-limits demand, regardless of the amount of money at stake. Underpinning NGAC's contention of the importance of a genuine liability dispute is Alabama's law precluding a negligence action where the plaintiff was contributorily negligent. Ms. Franklin contends, on the other hand, that the arguable-reason test plays only a limited role under Alabama law in a third-party bad-faith insurance case, and that the arguable-reason test is an element of the plaintiff's claim only in first-party insurance cases. Further, Ms. Franklin argues that the proper test for evaluating a third-party bad-faith claim is multi-factored.

. . . Ultimately, after going back to the genesis of the third-party bad-faith claim, the court finds that under Alabama law, a totality-of-circumstances approach governs as to claims alleging an insurer's alleged bad-faith failure to investigate and settle a third-party claim, and that the arguable-reason test is not an element of the claim, but rather one of many factors to be considered. To understand how this conclusion was reached, discussion of the history of both first- and third-party claims in Alabama is helpful, and necessary.

In a first-party claim, an insured sues the insurer for failure to pay a direct claim covered under a policy. Whereas, in a third-party claim, the insured, after exposure to a judgment in excess of policy limits, sues the insurer for its failure to settle the third-party claim within policy limits. First-party and third-party bad-faith claims have separate geneses under Alabama law.

## 1.  The Genesis of the Third–Party Bad–Faith Claim

The third-party bad-faith claim was the first born, arriving in the summer of 1953. In *Waters v. American Casualty Co. of Reading, Pa.*, 73 So.2d 524 (Ala.1953), the divisive inquiry was whether an insurer's liability for a judgment exceeding policy limits after the insurer refused an opportunity to settle within the policy limits derives from negligence or the doctrine of bad faith. The Alabama Supreme Court held that an insured may predicate liability on negligence or bad faith or on both. The court explained that, in the third-party bad-faith context, "when an opportunity is presented to the insurer to make a settlement of the claim in an amount not more than the limit of liability," but the insurer refuses and that refusal "is the proximate result of bad faith," the insurer is "liable for the full amount of the judgment, notwithstanding it is in excess of the limit fixed in the policy." *Id.* at 531–32. "[I]t is a question for the jury from *all the facts and circumstances* to determine whether the failure on the part of the insurer to make a settlement is an act of negligence or one of bad faith." *Id.* at 529 (emphasis added). The court did not deem it necessary to opine further upon the application of "negligence" or "bad faith," given that the terms had "well understood meaning[s]." *Id.* It observed, though, that bad faith "is tantamount to an intentional failure to perform [required] duties," and that "the mere failure on the part of the insurer to make a settlement within the limits of his contract when he has an opportunity to do so is not alone evidence of negligence or bad faith." *Id.* at 529.

On rehearing, however, the *Waters* court accepted the invitation to elaborate upon "the application of the rules of negligence and bad faith" in third-party cases. *Id.* at 531. The court explained:

> A failure to exercise ordinary diligence proximately causing damage to the insured is actionable in tort. The contract of insurance gives the insurer the exclusive right to make a settlement of the claim against [the] insured. That right imposes a corresponding duty raised by law to observe ordinary diligence in performing that power, when in the exercise of it. So that, when an opportunity is presented to the insurer to make a settlement of the claim in an amount not more than the limit of liability, the law raises a duty on his part to use ordinary care to ascertain the facts on which its

performance depends if he has not already done so. If the insurer neglects to exercise ordinary diligence in ascertaining these facts, if he has not already done so, and as a proximate result of such neglect he fails to make such a settlement, which is available, and when such knowledge would have caused a reasonably prudent person to do so, and a verdict and judgment are rendered against insured in an amount more than the limit of liability in the policy, the insurer should be held liable to the insured for the full amount of the judgment.

If the insurer has already made the investigation and ascertained the facts, to which we have referred *supra*, and refuses to make such proffered settlement, if such refusal is due to the honest judgment of insurer that the facts do not warrant such a settlement, and the insurer was not negligent in the manner of defending the suit, he would not be liable to [the] insured for an amount in excess of the limit of liability provided in the policy, although the verdict and judgment were in excess of it. But if such refusal to settle under those circumstances is the proximate result of bad faith on the part of the insurer, he would be liable for the full amount of the judgment, notwithstanding it is in excess of the limit fixed in the policy.

*Id.* at 531–32.

To summarize, the *Waters* decision imposes upon an insurance company a duty to use ordinary care in the exercise of its exclusive right to settle a third-party claim against its insured and emphasizes a totality-of-circumstances approach. Specifically, *Waters* held that whether the insurance company acted negligently or in bad faith in the exercise of its settlement authority depends upon "*all the facts and circumstances.*" *Id.* at 529 (emphasis added). While negligence and bad faith are separate torts, the *Waters* decision reveals that the same facts and circumstances are relevant for determining the degree of the insurer's culpability, namely, whether the insurer has acted negligently or in bad faith. *See also Allen's Alabama Liability Insurance Handbook*, § 13.09, at 286 (2d ed.2008) (noting the similarity of proof required in negligence and bad-faith claims

in the third-party context).

Although *Waters* did not provide a specific list of facts and circumstances for consideration, the opinion highlights the following: (1) the insurer has a duty to use ordinary care to ascertain facts that are necessary for an enlightened decision about whether a settlement of a third-party's claim within policy limits is warranted; (2) the insurer's refusal to settle based upon an honest judgment that the facts do not warrant a settlement does not rise to the level of negligence or bad faith; (3) bad faith results when the insurer intentionally fails to perform its duties; and (4) the insured's mere failure to settle within the policy limits, when presented the opportunity, is insufficient by itself to amount to negligence or bad faith.

Twelve years after *Waters*, the third-party bad-faith claim again was the subject of discussion in *Hartford Accident & Indemnity Co. v. Cosby*, 173 So.2d 585 (Ala.1965). In *Cosby*, which was an excess-judgment suit brought by the insured against the insurer, the insurer assumed control of the defense in a third-party suit brought against its insured and refused to settle within the $25,000 policy limits, after which the third party obtained a $75,000 judgment against the insured. The Supreme Court of Alabama cited a Fifth Circuit decision as persuasive authority on what proof is required to prevail on a third-party bad-faith claim:

> [T]he insurer cannot escape liability by acting upon what it considers to be for its own interest alone, but it must also appear that it acted in good faith and dealt fairly with the insured. The insurer, as it had a right to do under the policy, assumed exclusive control of the claim against the insured, and took unto itself the power to determine for the insured all questions of liability, settlement, of defense and management before and during trial, and of appeal after final judgment. We are of opinion that this relationship imposes upon the insurer the duty, not under the terms of the contract strictly speaking, but because of and flowing from it, to act honestly and in good faith toward the insured. It was open to the jury to find that the insurer did not perform this duty. *Id.* at 604–05 (*citing Am. Mut. Liability Ins. Co. of Boston v. Cooper*, 61

F.2d 446, 448 (5th Cir.1932)).

Cosby reaffirms the totality-of-circumstances approach and highlights that the insurer must "deal[ ] fairly" with its insured and "act honestly and in good faith" in refusing an offer to settle a third-party claim against its insured. *Id.*

Almost twenty-five years after *Cosby*, in 1989, the Alabama Supreme Court decided *State Farm Mutual Automobile Insurance Co. v. Hollis*, 554 So.2d 387 (Ala.1989). *Hollis* involved a third-party negligent failure-to-settle claim, not a third-party bad-faith claim, but it is instructive because the same factors govern whether an insurer negligently failed to settle a third-party claim or acted in bad faith. The *Hollis* court reaffirmed the *Waters* decision as establishing the criteria for the third-party insurance claim and rejected the argument that the insurer's "sincere belief that [its insured] had not been negligent" could defeat third-party negligence. *Id.* at 390. "[T]he good faith standard requires more than proof of sincerity." *Id.* "The insurer has a fiduciary duty to look after the insured's interest at least to the same extent as its own, and to make a knowledgeable, honest, and intelligent evaluation of the claim commensurate with its ability to do so. If the carrier fails to do this then it is liable to the insured for all damages occasioned thereby." *Id.* at 391–92 (citation and internal quotation marks omitted). Citing out-of-state authority as persuasive, the *Hollis* opinion also reiterated a totality-of-circumstances approach:

> *While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation [of settlement of a third-party claim] requires more.* It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial.

*Id.* at 391 (citation and internal quotation marks omitted). *Hollis* highlights additionally that consideration of the insured's interests is a paramount

77

consideration. *See id.* at 391 n.2 ("[W]hat might be neglect in one instance could well constitute bad faith on the part of the insurer. The question is always: Did the insurer exercise that degree of skill, judgment, and consideration for the welfare of the insured which it, as a skilled professional defender of lawsuits having sole charge of the investigation, settlement, and trial of the suit may have been expected to utilize?" (citation and internal quotation marks omitted)).

## 2. The Genesis of the First–Party Bad–Faith Claim

Twenty-eight years after the *Waters* decision, the Supreme Court of Alabama brought into the fold the first-party bad-faith claim. *Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405 So.2d 1, 6 (Ala.1981) ("The law will not allow an insurer to willfully refuse to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at his weakest and most perilous time of need."). With respect to the "standard of proof an insured is required to meet in order to recover on a claim for bad faith" in the first-party context, the court held that "an actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal." *Id.* at 7 (internal quotation marks omitted; emphasis added); *see also Nat'l Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala.1982) (explaining that based upon *Chavers*, "[a]n insurer is liable for its refusal to pay a direct claim when there is no lawful basis for the refusal coupled with actual knowledge of that fact" and that "[n]o lawful basis means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." (citation and internal quotation marks omitted)).

## 3. This Court's Findings as to the Proper Standard of Review

On the basis of the Alabama Supreme Court's decisions in *Waters, Cosby*, and *Hollis*, the court finds untenable NGAC's position that an insurer is not liable on a third-party bad-faith claim where it has an arguable or debatable reason to deny a claim. Neither *Waters* nor *Cosby* nor *Hollis* mentions an arguable-reason test as an element of a plaintiff's third-party claim or suggests that an insurer can prevail if the insured cannot show the

absence of an arguable reason for the insurer's refusal to accept a policy-limits settlement of the claim against the insured by a third party. To the contrary, these decisions command a totality-of-circumstances approach. *See, e.g., Waters*, 73 So.2d at 529 (holding that whether an insurance company acted in bad faith in the exercise of its settlement authority depends upon "all the facts and circumstances").

Additionally, in *Waters*, the court rejected an argument similar to the one that NGAC makes in this case. In *Waters*, the insurer had argued that the insured should be "estopped" from asserting that the insurer "was guilty of bad faith or negligence in his decision to try the case ... and not to settle" it because the insured consistently maintained in the underlying action that he had not been negligent. *See* 73 So.2d at 531.[40] The court disagreed, opining that "[t]hese facts were for the consideration of the jury along with all the other facts and circumstances of the case." *Id.* (emphasis added). *Waters* indicates that an insurer's pre-suit refusal to settle a third-party's claim against its insured based upon the insured's headstrong denial of liability is a factor, but it is not the only factor relevant to the inquiry of whether the insurer engaged in bad faith in the evaluation of a third-party settlement offer. *Hollis* confirms *Waters*'s stance. *See Hollis*, 554 So.2d at 391 ("While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation [of settlement of a third-party claim] requires more.").

Furthermore, the *Chavers* court expressly held that its test applied to a "direct claim," 405 So.2d at 7, and, in recognizing a new tort for first-party bad faith, it did not disown the third-party bad-faith claim. Rather, it acknowledged the distinctions between first-party and third-party insurance claims. *See* 405 So.2d at 5. The distinctions between the two types of claims support Alabama courts' different treatment of the claims. Alabama courts do not stand alone.

As explained by the Arizona Supreme Court, which also holds first-party and third-party claims to different standards and restricts the

---

[40] As previously noted, the facts of the instant case parallel those in *Waters*. In the instant case there is undisputed evidence that Murphree wanted to proceed to trial because she felt like she was in the right; she had the green light.

arguable-reason test to the first-party bad-faith claim,

> an insurer owes its insured the same duty of good faith and
> fair dealing in both first- and third-party actions. The standard
> for determining whether the insurer has breached its duty,
> however, is different in the two types of cases because of the
> different relationships and duties that exist between the
> parties. In third-party actions, the insurer exclusively controls
> settlement and the insured bears a disproportionate share of
> the risk if the insurer fails to accept a reasonable settlement
> offer within policy limits. The insured faces personal liability
> for an award exceeding policy limits, while the insurer's
> potential liability remains constant at policy limits.
> Therefore, although the "fairly debatable" standard
> sufficiently protects both parties' interests in first-party
> actions, it inadequately protects the insured's interests in
> third-party actions.

*Clearwater v. State Farm Mut. Auto. Ins. Co.*, 792 P.2d 719, 723–24
(Ariz.1990) (internal citation omitted). In the third-party bad-faith context,
"the debatability of the claim is not determinative; the insurer must also
weigh other considerations, such as the financial risk to the insured in the
event of a judgment in excess of the policy limits." *Id.* at 723.

### 4. The Outlier Decision: *Mutual Assurance, Inc. v. Schulte*, 970 So.2d 292 (Ala.2007)

NGAC contends that *Mutual Assurance, Inc. v. Schulte*, 970 So.2d
292 (Ala.2007), is clear authority for its position that the arguable-reason
test is an element of a plaintiff's claim in a third-party bad-faith case. In
*Schulte*, the Alabama Supreme Court affirmed the trial court's order
denying summary judgment to the insured on a third-party
negligent-failure-to-settle claim. It "express[ed] no opinion," however, "as
to that part of the trial court's order denying [the insurer's]
summary-judgment motion as to the bad-faith-failure-to-settle claim
because [its] decision on the negligent-failure-to-settle claim and the
unique procedural posture of this case render[ed] a review of that claim
unnecessary." *Id.* at 294. Nonetheless, the Alabama Supreme Court later

remarked in the same opinion that "the inquiry relevant to a claim alleging bad-faith failure to settle is whether the insurer's failure to settle had any lawful basis, that is, whether the insurer had any legitimate or arguable reason for failing to pay the claim." *Id.* at 296 (citations and internal quotation marks omitted). NGAC's position that Schulte correctly recites Alabama's standard for analyzing a third-party bad-faith claim is shaky for at least two reasons.

First, the Supreme Court of Alabama deemed it unnecessary to address the third-party bad-faith claim based upon an agreement between the parties that rendered the claim moot. The lone sentence upon which NGAC then relies is not part of the court's holding. Rather, it is "mere obiter dictum," and not binding authority. *Ex parte RCHP–Florence, LLC*, ⸺ So.3d ⸺, 2013 WL 4873468, at *8 (Ala.Civ.App.2013) (*citing Wilkinson v. Rowe*, 98 So.2d 435, 440 (Ala.1957) ("If we were to express an opinion based on facts not shown by the record in this case, that opinion would be dicta and would not be binding in subsequent cases.")). One of the concurring justices in *Schulte* also recognized the narrow holding of the main opinion, sweeping the rest of it into the bin of dicta. *See* 970 So.2d at 298 (Because the "only question before this Court ... is the very narrow question whether the existence of a validly enacted statute automatically precludes in every case any further inquiry into whether an insurer has acted reasonably in presuming the constitutionality of that statute and relying thereon in its decision not to settle a claim against its insured" and "because upon our decision of this question other issues will become moot in light of the parties' agreement ..., the discussion of other issues is dicta.") (Murdock, J., concurring in result).

Second, although dictum can be persuasive and telling as to how a state court would hold, this court is not convinced that the Alabama Supreme Court would find *Schulte*'s dictum convincing. The dictum is unaccompanied by any analysis. And, although it leans upon a string cite of two decisions for support, those two decisions were analyzing first-party bad-faith claims, not third-party bad-faith claims. Adoption of the standard NGAC draws from the *Schulte* dictum would require the Alabama Supreme Court to turn a blind eye to more than fifty years of precedent, where not once has the court incorporated the arguable-reason test as an element of a third-party bad-faith claim. Because the dictum in *Schulte* upon which

NGAC relies contradicts *Waters*' totality-of-circumstances approach, it is deemed a non-binding, stray remark.

*Franklin v. Nat'l Gen. Assur. Co.*, No. 2:13-CV-103-WKW, 2015 WL 350633, at *10-15 (M.D. Ala. Jan. 23, 2015)(Watkins. J.)(emphasis by italics in original) (bracketed alterations in original).

Not only does the *Franklin* opinion explain that Alabama uses the "totality of the circumstances," rule in judging bad faith failure to settle and negligent failure to settle cases, it also points out that, in the *Waters* decision, the Alabama Supreme court rejected the same argument made by Alfa here. The undersigned is persuaded that *Franklin* was correctly decided and applies it here. Summary judgment is not appropriate merely because Murphree maintained that she did not run the red light, and insisted that the case be tried. It is only one fact to be considered.[41]

---

[41] Leo also argues that Murphree's opinion on settling the case is of no consequence because "Alfa, and only Alfa, [had] sole authority to settle or not settle the underlying action as it saw fit." (Doc. 123 at 14). In support of this argument, Leo cites:

– the policy language of the policy which covered Murphree, which states, *inter alia*, "[w]e will settle or defend lawsuits . . .as we consider appropriate," and "[w]e have the right the investigate, negotiate and settle any claim or suit." (Doc. 123 at 14 (quoting doc. 66-1 at 3)).

– the Alabama Supreme Court's statement in *Blackburn v. State Farm Auto. Ins. Co.*, 652 So. 2d 1140, 1142 (Ala. 1994), that policy language of that sort means that "[t]he insured may not compel or prevent such a settlement."

– *Allen's Alabama Liability Insurance Handbook* for the proposition that "'the insurer has the exclusive control of the claim against its insured;'" "'[t]he right [of settlement] is reserved for the insurer's personnel to determine not only the amount of any settlement, but the manner to negotiate, if at all, with an insured's attorney;'" and "'by the terms of the

### b.     The Fact that Alfa Relied on Walker's Representations Is Not an absolute Bar to the Claims against Alfa

Alfa next argues that it is entitled to summary judgment on all "failure to settle claims," which it identifies as the claims of negligent, wanton, and bad faith failure to settle, because it relied on Walker's representations that Murphree was informed of the dangers of the case, and "made an informed decision to oppose settlement."  (Doc. 104 at 31; *see also*, doc. 104 at 32-36).   In support of this argument it cites, without discussion, *Nat'l Sur. Corp. v. W. Fire & Indem. Co.*, 318 F.2d 379, 385 (5th Cir. 1963), a case which does not interpret or discuss Alabama law.

As noted in the previous section, under binding Alabama law, the trier of fact must consider the "totality of the circumstances" in deciding whether Alfa should be liable for failure to settle.   The advice given to Alfa by its attorney is merely one of the circumstances to consider.[42]

---

insurance contract, an insurer may do as it likes, as far as settlement is concerned.'"  (Doc. 123 at 15 (quoting Bibb Allen, *Allen's Alabama Liability Insurance Handbook* § 13.18 (2nd ed. 2008)).

– Ivey Gilmore's opinion that Murphree's desire to try the case "doesn't matter," because Alfa had the power to settle the case "whether their insured like[d] it or not."  (Doc. 123 at 16).

Leo misses the point with these arguments.  No one disputes the fact that Alfa could have settled the case without Murphree's consent.  The only question is, although it had that control, is it absolved from liability because Murphree did not want to settle, and it heeded its insured's wishes.  Regardless, based on this court's holding, this argument is moot.

[42]   In three separate places, when arguing this point, Alfa seems to argue that there is a lack of evidence to support Counts Two and Three as a whole.  First, Alfa writes:

c.        **Wanton Failure to Investigate or Settle**

Alfa notes that the tort of "wanton" failure to investigate or settle has not been

recognized in Alabama.     (Doc. 104 at 36-37) (*citing State Farm Mut. Auto. Ins. Co. v.*

*Hollis*,  554  So.  2d  387,  392  (Ala.  1989)  ("We  have  not  had  occasion  to  determine

---

Alfa acted innocently and in accordance with the reports and recommendations of
Murphree's assigned counsel in making its determination not to accept the policy
limits demand.

In contrast, bad faith failure to settle is, "in essence, . . . the intentional
failure to settle a claim." *State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So. 2d 387,
392 (Ala. 1989) (discussing *Hollis v. Scott*, 516 So. 2d 576 (Ala.1987)).
Wantonness requires proof that Alfa, with reckless indifference to the
consequences, consciously and intentionally did some wrongful act or omitted some
known duty. *Wal-Mart Stores, Inc. v. Thompson*, 726 So. 2d 651, 654-55 (Ala.
1998). There is no evidence of either.

(Doc. 104 at 32) (emphasis added).  Next, after discussing Walker's reports to Alfa, Alfa contends,
in one sentence, that "[i]n light of the foregoing, Alfa must be granted summary judgment on all
[p]laintiff's claims for failure to settle."  (Doc. 104 at 36) (emphasis added).  Finally, in concluding
the discussion of whether Alfa's reliance on Walker's reports provides it a complete defense, Alfa
writes that "there is no evidence of intentional bad faith or wantonness by Alfa."  (Doc. 104 at 36).

Alfa may attempt to meet its burden on summary judgment by "showing" that there is an
absence of evidence to support Counts Two and Three as a whole.  *See Fitzpatrick*, 2 F.3d at
1116.  However, the quoted language, when read in context, argues only that, because Alfa relied
on Walker, there is no evidence of intentional bad faith or wantonness.  Indeed, in the introduction to
its argument, Alfa makes this very point when it says: "There is no evidence of bad faith or
wantonness since Alfa acted according to the reports of counsel that there was disputed liability and
questionable damages."  (Doc. 104 at 25).  The court does not read these statements as putting Leo
on notice that he had to provide all of his evidence in support of these counts. *See*, *T.P. ex rel. T.P.
v. Bryan Cty. Sch. Dist.*, 792 F.3d 1284, 1291 (11th Cir. 2015) ("district courts should not be
expected to construct full blown claims from sentence fragments, appellate courts should not permit
those same fleeting references to preserve questions on appeal.") (internal citations and quotations
omitted).  (*See also*, doc. 123 at 22 (Plaintiff's Response Brief) ("Alfa does not present any
evidence or argument as to the evidence, or lack thereof, of wantonness."))).  Because Alfa did not
clearly raise the broader argument of lack of evidence, the court will not address it.

whether a cause of action for wantonness is viable.")).   Alfa then states, without providing

any argument, that "[t]here is no basis for creating a new tort."   (Doc. 104 at 37).   The

plaintiff's response merely acknowledges that the issue has not yet been decided by the

Alabama Supreme Court.   (Doc. 123 at 22). He does not explain why a new tort would

be recognized by the Alabama Supreme Court.   In light of these undeveloped arguments

by both sides, summary judgment on this issue will be denied. *See Resolution Trust*

*Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon

the district court to distill every potential argument that could be made based upon the

materials before it on summary judgment. . . . Rather, the onus is upon the parties to

formulate arguments[.]").

### d.   Negligent Failure to Investigate

Alfa argues that there is "no cognizable claim in Alabama for negligent failure to

investigate."   (Doc. 104 at 37). Alfa also argues that Leo "cannot offer substantial

evidence that Alfa was negligent in investigating Cameron's claim." (Doc. 104 at 38).

Alfa also writes:

> Alfa promptly assigned an adjuster to the claim, and the adjuster promptly
> took witness statements and properly managed the file. When suit was
> filed, the claim was assigned to a manager, and legal counsel was assigned
> to represent the insured and to report on developments in the case.
> Accordingly, Alfa must be granted summary judgment on Plaintiff's claim
> for negligent failure to investigate.

(Doc. 104 at 38).

In response, Leo argues that his claim for negligent failure to investigate "is encompassed within and subsumed by the negligent failure to settle [claim]." (Doc. 123 at 23). He then cites to the following from Gilmore's deposition as evidence that the claim, for negligent failure to investigate and settle, is viable:[43]

Q. Okay. What criticism do you have of Mr. Elrod regarding his investigation?

A. Oh, I think Mr. Elrod was doing his job when he went out and took the statements. What I mean by Alfa's conduct during the claims process and its unreasonable failure to investigate and settle is that Alfa, Mr. Lyon in the home office, is choosing to ignore the facts that he has uncovered. This was a bad accident. It is a disputed liability claim. We have an elderly woman badly injured. You have got witnesses for the plaintiff and for the defendant. This lady had a closed-head injury, she had a fracture to the neck, fractured pelvis, deep vein thrombosis, and early on the retail specials were reported as excess of two fifty. So the initial investigation should have put Alfa on high alert that this was a bad case, a dangerous case. And ultimately Ms. Walker accurately described it as a dangerous case. And so when I say there is an unreasonable failure to investigate and settle, Alfa early on is starting to develop a picture of a serious, serious accident involving an older lady, elderly lady; I think she was in her seventies. And we have a young female who claims she has the red light -- that Alfa's insured had the red light or right-of-way. There was a statement I read in there from Robby Elrod where Ms. Murphree says in the statement, if I recall, I guess we can look at it, that she observed Ms. Cameron before the collision. That should have given Alfa, Mr. Elrod and Mr. Lyon a strong sense that this is a bad case, this is a dangerous case. And later that was characterized appropriately by Ms. Walker.

---

[43] The briefs set out these arguments, and their responses, in a confusing manner. For example, Leo's argument in response to whether there is evidence to support this claim appears in document 123 at 20-22, and his response to whether a claim exists for negligent failure to investigate appears in document 123 at 23.

86

So they should have been on high alert early on that this was a bad case. And it took some several months, if not a year or two -- I think the accident happened January 25th. They know pretty -- Alfa knows pretty quickly that this is a bad injury, disputed liability. Ultimately the lawsuit was filed on April 1st, and there was a moderate reserve placed on the file. So I criticize Alfa for not putting a policy limits reserve on it immediately, because the facts as they are uncovering them suggest this is a bad case, and it ultimately turned out to be a bad case.

(Doc. 115-1 at 10(40)-11(41)).[44] Leo states that Gilmore's opinions establish "that a verdict in excess of the policy limits was probable." (Doc. 123 at 21-22).

The cited testimony fails to set out an applicable standard of care at all. All it does it establish that Alfa had enough information to know "this is a bad case." Certainly, Gilmore is correct that Alfa had enough information to know that there could be a judgment in excess of policy limits if Murphree lost on liability. Nothing about Gilmore's testimony suggests that such a result was likely, or that, even if it was likely, that failing to settle would be a breach of some, unmentioned, applicable standard of care.

To the extent that Counts Two and Three are based upon the negligent failure to investigate the underlying claim/case, summary judgment is appropriate.[45]

---

[44] Leo also cites to opinions from Gilmore's report, which, as noted above, will be stricken and not considered. However, the court has reviewed the two short quotes cited from the report on this issue. (*See* doc. 123 at 20, 21). The court concludes that, even if these opinions were considered, they fail to provide any support for Leo's claims. The quotes vaguely reference "conduct," and the fact that Alfa had "enough discovery and information," without providing specifics. Neither quote states exactly what the standard of care is. The information in the quotes provides nothing that would assist the trier of fact.

[45] In its reply brief, Alfa argues generally that "Leo has not offered any evidence of bad faith or negligence by Alfa." (Doc. 130 at 14; *see also* doc. 130 at 14-15). Except in the specific cases

### 3.    *Count Four – Suppression*

Count Four of the Second Amended complaint sets out several facts which were known by Alfa, but allegedly "suppressed" from Murohree, both before and after the trial of the Underlying Action.   Alfa argues, in part, that there is no factual support for this claim. (Doc. 104 at 39).

In response, Leo fails to cite to <u>any</u> evidence supporting this claim, stating only:

> The elements of Plaintiff's suppression claim are: "(1) [that Alfa] had a duty to disclose an existing material fact; (2) [that Alfa] concealed or suppressed that material fact; (3) [that Alfa's] suppression induced [Murphree] to act or refrain from acting; and (4) [that Murphree] suffered actual damage as a proximate result." *Crestview Meml. Funeral Home, Inc. v. Gilmer*, 79 So. 3d 585, 590 (Ala. 2011)(quoting *Coilplus–Alabama, Inc. v. Vann*, 53 So.3d 898, 909 (Ala.2010)).
>
> Plaintiff alleges that Alfa was duty-bound to disclose but intentionally, negligently, wantonly, and/or recklessly suppressed the following facts: (i) the need to seek personal counsel, (ii) the considerable risk as a result of the failure to timely offer policy limits by Alfa, (iii) the

---

previously set out in the body of this opinion, this argument was not made in Alfa's initial brief.  "As a general rule, federal courts do not consider arguments that are presented for the first time in a reply brief."  *Rindfleisch v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295, 1301 (N.D. Ga. 2014) (*citing Herring v. Sec'y, Dep't of Corrections*, 397 F.3d 1338, 1342 (11th Cir.2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotation marks, alterations, and citation omitted).  That rule is particularly applicable on summary judgment where the burden is on Alfa to show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Fitzpatrick*, 2 F.3d at 1116.  Only after such a showing is made must the non-movant rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17.  When allegations of lack of evidence to support a claim are made for the first time in a reply brief, the non-movant does not have an opportunity to rebut them.  The court will not consider Alfa's argument on this point.

repeated and constant policy limit demands being made by Cameron's lawyers, (iv) Walker's failure and/or refusal to make demand upon Alfa to pay the policy limits, (v) the existence of viable legal claims against Alfa as it pertains to its handling of the underlying legal claim by Cameron and the need to speak to personal counsel about the possibility of bringing legal claims against Alfa, (vi) the negative effect on Murphree of filing bankruptcy and how such a filing would advantage Alfa, and (vii) the legal rights being surrendered by signing the COVENANT NOT TO SUE.

(Doc. 123 at 24). This is nothing more than a mere recitation of the elements of a claim for suppression, along with a conclusory statement of the plaintiff's claim. Leo has failed to meet his burden to set forth evidence of specific facts. *Lewis*, 518 U.S. at 358. Summary judgment will be granted as to Count Four.[46]

### 4.   *Count Five – Conspiracy*

Alfa argues that the conspiracy claims in Count Five should be dismissed because summary judgment is due on the underlying claims, or "wrongful acts." (Doc. 104 at 42; *see also,* doc. 104 at 26 ("The . . . claim for conspiracy . . . fail[s] because [it is] contingent on the viability of other causes of action.")). In Alabama, if "the underlying cause of action is not viable, the conspiracy claim must also fail." *Thompson Properties 119 AA 370, Ltd. v. Birmingham Hide & Tallow Co.*, 897 So. 2d 248, 267 (Ala. 2004). Because Counts Two and Three will survive to some extent, and given the limited nature of Alfa's argument regarding this claim, the conspiracy claim will also survive summary

---

[46]   Alfa also argues that Leo cannot prove damages resulting from any alleged suppression. (Doc. 104 at 39-40). Leo completely fails to respond to this argument. For this reason as well, the motion for summary judgment will be granted as to this suppression claim.

judgment.

### 5.    *Damages*

Alfa first argues that, due to Murphree's death, there is no evidence of mental anguish arising from the events described in the complaint.   (Doc. 104 at 44-45).   In response, Leo cites to the statements of Murphree's mother, Burgess, in which Burgess addresses Murphree's mood and the causes for that mood.   As noted above, this court has stricken all such statements by Burgess, except the general statements that, during this time, Murphree was "agitated," "stressed," "worried," "concerned, "disappointed," and had her spirits "dampened."    Without evidence linking those feelings to the conduct in the complaint, there is no evidence supporting the mental anguish claim against Alfa. Accordingly, summary judgment will be granted as to that claim.

Further, as noted by Alfa, Leo cites no authority that he can legally obtain attorney's fees in this matter.   (Doc. 104 at 45).   Leo also fails to respond to this argument.  The attorneys' fees claim will be dismissed.

Lastly, Alfa argues that Leo has "failed to account for Alfa's post-trial payment of the policy limits of $100,000."  (Doc. 104 at 45).   Alfa contends that, to the extent it is found to be liable, the correct calculation is the difference between the $260,000 judgment, and what is says it has already paid, $100,000.   Leo's response to this argument confusingly discusses where the limits check was sent and an alleged

conspiracy to delay the sending of same.  However, he does not seem to dispute that Alfa would be entitled to a credit as to any amount they actually paid.  Regardless, the Second Amended Complaint seeks a sum "to be determined by a jury, which will fairly and adequately compensation the [p]laintiff for injuries and damages sustained."  (Doc. 96 at 55).  The trier of fact can take into account any applicable credits at the appropriate time.  Summary judgment will be denied as to this claim.[47]

### 6.    *Count Six – The Malpractice Claim against Walker*

Because of the nature of the attack made in Walker's motion for summary judgment, it is important to note the exact bases for this count.  In several pages of his Second Amended Complaint, Leo alleges that Walker is liable under Ala. Code § 6-5-570, *et seq.*, because she "negligently, carelessly, recklessly, and/or wantonly breached acceptable standards of practice in providing legal services" by engaging in 19 different acts before the verdict in the underlying case.  (Doc. 96 at 46-49).  Specifically, that she:

> (a) Choose [sic] to place the interest of ALFA and WALKER's own financial interest ahead of the interests of her client, MURPHREE[;]

> (b) Choose [sic] to align herself with ALFA and against the best interests of her client MURPHREE as evidenced by her statement that "we" [that is WALKER and ALFA] have many defenses" to MURPHREE's potential negligent failure to settle action[;]

---

[47] Alfa, in passing, in the introduction to its argument regarding damages, states that Leo cannot recover damages for "injured credit."  (Doc. 104 at 44).  The court will not consider this underdeveloped argument.

(c) Failed to fairly and objectively evaluate the case against MURPHREE[;]

(d) Failed to recommend to ALFA that ALFA pay its policy limits or at least make some effort to settle the case against its insured MURPHREE[;]

(e) Failed recommend to MURPHREE that MURPHREE request that ALFA settle the case[;]

(f) Failed to provide ALFA with a thoroughly realistic, objective and honest assessment of Cameron's claims against MURPHREE[;]

(g) Failed to provide MURPHREE with a thoroughly realistic, objective and honest assessment of Cameron's claims against MURPHREE[;]

(h) Failed to properly and adequately advise MURPHREE of the need (not just the right) to seek personal counsel;

(i) Failed to properly advise and counsel MURPHREE concerning the facts and law of the *Cameron v. Murphree* case[;]

(j) Failed to properly advise and counsel MURPHREE regarding the likelihood of successfully defending the *Cameron v. Murphree* case[;]

(k) Failed to properly advise and counsel MURPHREE regarding her potential monetary exposure in the *Cameron v. Murphree* case[;]

(l) Failed to properly advise and counsel MURPHREE regarding the risks and benefits to MURPHREE of ALFA either settling case or proceeding to trial[;]

(m) Failed to properly and clearly advise MURPHREE of WALKER and ALFA's conflicts of interest with MURPHREE both once a policy limits demand was made, and once the excess verdict was rendered[;]

(n) Failed to accurately and timely apprise MURPHREE of ALFA's refusal to tender or offer the applicable policy limits in the underlying action;

(o) Failed to properly and timely advise MURPHREE of the repeated and

constant policy limit demands being made by Willow Joe Cameron's lawyers and their willingness to fully and finally release MURPHREE in exchange for a payment of ALFA's policy limits;

(p) Conditioned any settlement negotiations with Cameron's counsel on the condition that Cameron's counsel enter into said negotiations with the understanding that the case was one of "disputed liability." That is, it would have to be negotiated within policy limits. Such a stance again placed the interest of ALFA (who only had its policy limits to loose) ahead of WALKER's own client MURPHREE (who could be financially crushed by even a relatively modest excess judgment)[;]

(q) Assumed and accordingly advised her client MURPHREE that Cameron's counsel were "just blowing smoke" with regard to their stated intention to collect any excess judgment from MURPHREE should ALFA not settle the case. Said advice was either intentionally misleading or a gross and abject failure to comprehend the situation at hand. Even cursory investigation or research would reveal that Plaintiffs do not as was WALKER's claimed experience "always accept policy limits[;]"

(r) Instructed MURPHREE to testify inconsistently with previous statements and/or sworn testimony at the trial of this matter; [and]

(s) Failed to reassess her own recommendations regarding settlement both before and after trial[;]

(Doc. 96 at 46-49) (capitalization in original) (original bold omitted).

The Second Amended Complaint also alleges that, after the jury verdict, Walker "negligently provided legal services in that she negligently, willfully, and/or wantonly breached the accepted standards of practice," in 17 different ways. (Doc. 96 at 49). Specifically, Leo states that Walker:

(a) Choose to align herself with ALFA and against the best interests of her client MURPHREE as evidenced by her statement that "we" [that is

93

WALKER and ALFA] have many defenses" to MURPHREE's potential negligent failure to settle action[;]

(b) Chose to avoid any direct contact with her client MURPHREE after the verdict and instead sent her newly licensed associate and daughter who WALKER knew or should have known was unable to properly advise MURPHREE concerning her post verdict options[;]

(c) Failed to ensure that her associate and daughter, WAGNER, knew MURPHREE's post-verdict options before sending her to deal with the MURPHREE by herself[;]

(d) Failed to advise MURPHREE, or otherwise make sure MURPHREE was advised, of her existing legal claims against ALFA for its handling of the underlying claim by Cameron;

(e) Chose to affirmatively suppress and hide the existence of MURPHREE's potential causes of action against ALFA[;]

(f) Failed to recommend that MURPHREE speak to outside or personal counsel about the possibility of bringing legal claims against ALFA, and that there were very significant conflicts of interest between MURPHREE and ALFA as well as MURPHREE and WALKER;

(g) Failed to recommend ALFA act in the best interest of her client post-verdict and pay the entire judgment or supersede the same on appeal[;]

(h) Recommended bankruptcy to dispose of Cameron's judgment;

(i) Drafted and procured execution of the COVENANT NOT TO SUE contract/release that was to the detriment of her client, MURPHREE, and to the benefit of WALKER and ALFA;

(j) Exerted improper control over MURPHREE by utilizing her influence as legal counsel while MURPHREE was incarcerated and engaged in self-dealing to advantage herself and ALFA;

(k) Failed to advise MURPHREE as to her options other than filing

bankruptcy in the post-verdict aftermath time period;

(l) Improperly conspired and worked with ALFA in order to procure $1200.00 in order to pay for the bankruptcy filing fee and lawyer so that ALFA could avoid an excess judgment situation and lawsuit;

(m) Improperly procured a release of liability for herself and ALFA to the detriment of her client MURPHREE;

(n) Improperly drafted the subject COVENANT NOT TO SUE in an attempt to defraud the United States Bankruptcy Court and/or deprive the Bankruptcy Court and/or trustee of MURPHREE'S testimony as to the terms and conditions of the bankruptcy;

(o) Failed to seek or discuss legal options of Motions For New Trial or Appeal with her client MURPHREE;

(p) Failed to disclose to MURPHREE how the bankruptcy filing advantaged ALFA who was paying WALKER's bill, in *Cameron v. Murphree* and many other cases both before and since; [and]

(q) Failed to make a demand on ALFA to pay the excess verdict[.]

(Doc. 96 at 50-52) (capitalization in original) (original bold omitted).

It is important that the court set out all of the bases for this claim, because not all of them are attacked by Walker. The court will address only those which are. Summary judgment will be summarily denied as to the unaddressed bases for this claim.

a.        The Covenant Not To Sue[48]

Walker argues that there are no damages which arise out of her drafting and Murphree's execution of the Covenant Not To Sue.  (Doc. 107 at 23).   Although Walker is not clear which portion of Count Six is attacked, this argument can only apply to paragraph 159(i) of Count Six of the Second Amended Complaint which alleges malpractice in that Walker "[d]rafted and procured execution of the COVENANT NOT TO SUE contract/release that was to the detriment of her client, MURPHREE, and to the benefit of WALKER and ALFA." (Doc. 96 at 51).  Leo responds that

> if the Court finds that the release is avoidable, the breach of the standard of care still remains as to the drafting and attempted procurement of release of potential claims. The corresponding damage from that breach is that Murphree was forced into an unnecessary bankruptcy . . . with all the attendant future financial problems[.][49]

(Doc. 122 at 27).

Leo's argument is untenable.   Murphree was not "forced" into bankruptcy as a

---

[48]   Walker's argument regarding whether this is a fraudulent transfer (doc. 107 at 22), has already been addressed by the court.  The court cannot see how the Covenant Not To Sue could operate to release any claims against Walker, since there is no evidence in the file of <u>any</u> consideration <u>from Walker</u> for Murphree's execution of the Covenant Not To Sue.  Further, Murphree was then only 19 or 20 years old, and she was <u>in jail</u> on drug charges — she was clearly unable to consult another lawyer before signing the Covenant Not To Sue.  However, although the plaintiff alleges <u>malpractice</u> based in part on these reasons, the plaintiff did not assert these reasons in defending its fraudulent transfer claims.  Nonetheless, for the reasons set out at Section IV.C.1. *supra*, the court has already found that those claims survive summary judgment.

[49]   In his brief, Leo notes that the phrase "with all the attendant future financial problems," comes from the expert report submitted by another of Leo's experts, Tom Burgess.  (Doc. 144-1 at 44).

result of <u>the preparation or signing of the release</u>.   Wagner discussed bankruptcy with

Murphree on the day of the verdict.   (Doc. 110-1 at 8(26)).   Before the covenant was

drafted, Murphree told Wagner that she wished to pursue bankruptcy, but expressed

concerns about whether Murphree could afford to do so.   The covenant came later.

"Negligence alone does not afford a cause of action. Liability will be imposed only when

negligence is the proximate cause of injury."   *City of Mobile v. Largay*, 346 So. 2d 393,

395 (Ala. 1977).   Summary judgment will be granted as Count Six, to the extent that that

count is based upon Walker's "[d]raft[ing] and procur[ing] execution of the COVENANT

NOT TO SUE contract/release that was to the detriment of her client, MURPHREE, and

to the benefit of WALKER and ALFA."

### b.       The Preparation and Trial of the Case

Walker next moves for summary judgment to the extent that the malpractice claim

is addressed to her conduct in preparing for and trying the underlying case.   (Doc. 107

at 24-27).   None of the conduct described in the Second Amended Complaint appears

directed to such conduct.   Regardless, Leo states that "Walker is correct in the sense that

[p]laintiff does not necessarily criticize Walker's technical skill as a litigator or her

advocacy in the Courtroom. In fact, [p]laintiff asserts that Walker did an excellent job

holding down a verdict which she and Alfa knew could have been significantly worse."

(Doc. 122 at 28).   Accordingly, to the extent that Count Six can be read as claiming

97

malpractice claims based on the preparation and manner of trial of the Underlying Action, summary judgment is appropriate and will be granted.

>   **c.   Whether Walker Had a Duty To Recommend to Murphree that Murphree Request that Alfa Settle the Case for Policy Limits**

Alfa next argues that

> Many of the Plaintiff Leo's allegations against Defendant Walker are centered on Leo's misplaced belief that Defendant Walker should have convinced Murphree to ask Alfa to accept the policy limits settlement demand.

(Doc. 107 at 27). As noted above, there are actually many more grounds for Leo's claim. Accordingly, the court will consider this argument to be attacking <u>only</u> the grounds stated in paragraph 158(e) of the Second Amended Complaint, which states that Walker "[f]ailed to recommend to MURPHREE that MURPHREE request that ALFA settle the case." (Doc. 96 at 46). Walker argues that she had no duty to advise Murphree to demand that Alfa settle "because Alfa had complete discretion with regard to whether to settle the case, or not." (Doc. 107 at 28).

It is undisputed that the policy language of the policy which covered Murphree states, *inter alia*, "[w]e [Alfa] will settle or defend lawsuits . . .as we consider appropriate," and "[w]e have the right the investigate, negotiate and settle any claim or suit." (Doc. 123 at 14 (quoting doc. 66-1 at 3)). Leo, in responding to Alfa's motion for summary judgment, admits that this language gives "Alfa, and only Alfa, sole authority

to settle or not settle the underlying action as it saw fit." (Doc. 123 at 14). *See,*

*Blackburn v. State Farm Auto. Ins. Co.*, 652 So. 2d 1140, 1142 (Ala. 1994) (noting that

such provisions give the insurer "the exclusive right to make a settlement of any claim

brought against its insured, within the limits of the policy.") (internal quotations and

citations omitted);   Bibb Allen, *Allen's Alabama Liability Insurance Handbook* § 13.18

(2nd ed. 2008). ("the insurer has the exclusive control of the claim against its insured;"

"[t]he right [of settlement] is reserved for the insurer's personnel to determine not only

the amount of any settlement, but the manner to negotiate, if at all, with an insured's

attorney;" and "by the terms of the insurance contract, an insurer may do as it likes, as far

as settlement is concerned."). One of Walker's experts, Tom Woodall, testified that

> the insurance company's obligation is not affected one  way or another by
> a demand or a request by the insured or by the insured's attorney.
>
>         The notion that they ought to demand or request something has no
> effect on the insurance company's obligation to evaluate the case and
> decide what they want to do.

(Doc. 119-1 at 15(57)).   Woodall agrees that the standard of care applicable to an

attorney would not require them to recommend settlement.   He explained that "the

responsibility of the attorneys is to honestly evaluate the case and provide the

information to the insurer. And the real issue is the sufficiency of the information

provided by the attorney to the insurance company[.]" (Doc. 119-1 at 15(60)).   Leo's

expert, Ivey Gilmore, agrees with this position, stating that Murphree's desire to try the

case does not matter, because Alfa had the power to settle the case "whether their insured like[d] it or not." (Doc. 115-1 at 21(83)).   Alfa's corporate representative, Wade Simpson, also stated in his deposition that Alfa had the right to, and could, settle a lawsuit over the advice of counsel.  (Doc. 112-1 at 24(91-92)).[50]

As noted, Leo "agrees with Walker that the sole authority to settle the case lies with Alfa."   (Doc. 122 at 35).   However, Leo insists that "Walker's argument ignores the fact that the standard of care nevertheless required Walker to recommend to Murphree that she demand Alfa to settle the case regardless of whether Alfa controlled settlement." (Doc. 122 at 35). Unfortunately, Leo cites no expert opinion or law for the proposition that Walker had to recommend to Murphree that the case be settled.

Leo cites the testimony of his expert, Tom Burgess, where Burgess stated "Ms. Walker didn't do that. She never did it," as evidence that Walker had a duty to advise Murphree to settle.  (Doc. 122 at 35 (quoting doc. 114-1 at 20(78)).  When the context of the testimony is analyzed, it is clear that Leo misconstrues that testimony. The full testimony, at the portion which includes these phrases, reads:

> In my opinion, Ms. Walker breached the . . . standard time after time after time. The core breach was a failure to do her duty first to Ashley . . . to make sure she fully and totally [was] informed that, number one, there is an opportunity and has been several to settle within the limits; and,

---

[50]  Woodall opined that the information Walker gave Alfa "was sufficient and that Alfa had everything that it needed to make its own determination as to whether the case ought to be settled or not."  (Doc. 107 at 29).

number two, the true consequences, and I'm not talking about necessarily getting deep into what bankruptcy is all about, but <u>the true consequences of what she may face if the case were not settled</u>. And Ms. Walker didn't do that. She never did it.

(Doc. 114-1 at 20(78)). This testimony does not stand for the proposition that the standard of care "required Walker to recommend to Murphree that she demand Alfa to settle the case."

Leo next points out that Burgess agreed in his deposition that there was "absolutely nothing," "that kept Ms. Walker from recommending Alfa settle the case even if Murphree didn't want it settled." (Doc. 122 at 35 (quoting doc. 114-1 at 21(83-84))). This language also does not establish a <u>duty</u> on the part of Walker to tell anyone that the case should be settled–just that Walker was not prevented from doing so.

Finally, Leo cites Burgess's testimony that "Alfa didn't need Walker to tell them [to settle the case], but <u>she should have been telling them</u>." (Doc. 122 at 36 (quoting 114-1 at 22(86)) (emphasis added)). This testimony does not set out that Walker had a duty to advise <u>Murphree</u> of anything. In the absence of an expert opinion that the standard of care required Walker to advise Murphree that she should demand that Alfa settle the case, summary judgment is appropriate as to this aspect of Count Six. [51, 52, 53]

---

[51] In her reply brief, Walker quotes the following testimony from Burgess's deposition, as evidence that Burgess agrees that Walker had no duty to tell Alfa to settle:

> The industry standard is that Alfa should have settled this case when its defense attorney for its insured was telling it that this case has a substantial exposure well above the -- well above the limits and there is a good chance that a jury will find

_____

liability, and [Walker] didn't need to say any more.

(Doc. 114-1 at 17(66)).  A reasonable jury could conclude that Burgess was only explaining Alfa's duty, not Walker's.  In other words, a reasonable jury could determine that Burgess was merely opining that Alfa had a duty to settle based on the undisputed evidence of what Walker actually told it, not that what Walker said was all that Walker needed to say.  Walker also cites Ivey Gilmore's statements that "the insurance company has exclusive right to do whatever it pleases, and whether the insured wants it settled or doesn't want it settled, it doesn't matter."  (Doc. 127 at 6 (quoting 115-1 at 21(83-84))).  Again, Gilmore was speaking to Alfa's duty, not Walker's.

[52]  Walker sums up her argument on this point with the following:

> The undersigned maintains the evidence and testimony all shows Defendant Walker honestly and objectively assessed and advised Murphree relative to the case against Murphree. Nevertheless, the ultimate issue is what the standard of care for a lawyer required of Defendant Walker, relative to the settlement demands; and in this context, it is erroneous to focus on whether or not Defendant Walker could have (or should have) done more to change Murphree's mind about settlement.  Instead, where Alfa had the exclusive right to pay the policy limits to settle, or not, the relevant question is whether or not Defendant Walker provided sufficient information to Alfa so that Alfa could make an informed decision. The facts stated hereinabove, and the discussion immediately following, shows Defendant Walker fulfilled that duty, and therefore met the standard of care.

(Doc. 107 at 30-31).  The court treats this argument as applying only to whether Walker had to advise Murphree to settle, and addressing the facts applicable to the standard, as enunciated by Woodall.  The court does not treat is as a general attack on the sufficiency of the evidence as to all grounds asserted in Count Six.

[53]  In her reply brief, Walker argues at length that, even if there is a duty to recommend settlement, "the lack of a recommendation to settle had no causative effect on the outcome of the underlying lawsuit." (Doc. 127 at 7; see also doc. 127 at 7-11).  This argument was not raised in her initial brief.  "As a general rule, federal courts do not consider arguments that are presented for the first time in a reply brief."  _Rindfleisch v. Gentiva Health Servs., Inc._, 22 F. Supp. 3d 1295, 1301 (N.D. Ga. 2014) (_citing Herring v. Sec'y, Dep't of Corrections_, 397 F.3d 1338, 1342 (11th Cir.2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotation marks, alterations, and citation omitted).  That rule is particularly applicable on summary judgment where the burden is on Walker to show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. _Fitzpatrick_, 2 F.3d at 1116.  Only _after_ such a showing is made must the non-movant rebut by either (1) showing that the record in fact contains supporting evidence sufficient to

**d.      Whether Walker adequately Advised Alfa of All the Information It Needed in order To Make a Decision To Settle**

Walker's brief also states that "[a]ll of the evidence shows [that] Walker adequately advised and informed ALFA of all information ALFA needed in order to make a decision to settle the case."  (Doc. 107 at 31; *see also* doc. 107 at 31-34).  She ends this section of her brief by stating:

> The undisputed evidence therefore clearly refutes each and every one of the Plaintiff's claim [sic] malpractice, <u>relative to allegations concerning Defendant Walker providing an adequate, honest and objective assessments of the case</u>, sufficient for <u>Alfa</u> to make an informed decision with respect to trial and settlement.
>
> To the extent Plaintiff Leo's claims for malpractice are premised on legal services related to <u>the assessment of the lawsuit and decisions whether or not to settle that case</u>, those claims are due be dismissed with prejudice.

(Doc. 107 at 33-34)(emphasis supplied).    Again, Walker is not specific as to which bases for the malpractice claim she is attacking.   However, these arguments could be fairly read to be directed only to Walker's interactions with <u>Alfa</u>, and appear only to attack the plaintiff's allegations that Walker:

> (c) Failed to fairly and objectively evaluate the case against

---

withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17.   When allegations of lack of evidence to support a claim are made for the first time in a reply brief, the non-movant does not have an opportunity to rebut them.  The court will not consider Walker's argument on this point.

MURPHREE [in her interactions with ALFA].

       (d) Failed to recommend to ALFA that ALFA pay its policy limits or at least make some effort to settle the case against its insured MURPHREE.

* * *

       (f) Failed to provide ALFA with a thoroughly realistic, objective and honest assessment of the Cameron's claims against MURPHREE.

* * *

       (s) Failed to reassess her own recommendations regarding settlement both before and after trial.

(Doc. 96 at 46-49) (capitalization in original) (original bold omitted). The court will deem the plaintiff to have been put on notice that he was required to present any evidence that he had in response to these specific claims.

Leo argues that "Walker breached the standard of care by failing to fairly and objectively evaluate the case and failing to provide a thoroughly realistic, objective and honest assessment of the claims to Murphree or Alfa." (Doc. 122 at 32; *see also* doc. 122 at 32-34). The only fact the plaintiff cites as evidence of these claims is the March 30, 2012, letter from Walker to Alfa, where Walker stated that Cameron's attorneys were just "blowing smoke." (Doc. 122 at 32).[54] However, "generally a plaintiff alleging

---

[54] Leo cites as evidence of this breach that

Walker knew from very early on in the litigation that Cameron had extensive medical bills exceeding $250,000, that there were at least two witnesses not in her

a legal-malpractice claim must prove that claim through expert testimony." *Wachovia Bank, N.A. v. Jones, Morrison & Womack, P.C.*, 42 So. 3d 667, 679 (Ala. 2009), as modified on denial of reh'g (Jan. 22, 2010) (*citing Tonsmeire v. AmSouth Bank*, 659 So.2d 601, 605 (Ala.1995) and Ala.Code 1975, § 6–5–580).[55] The plaintiff provides no expert opinion which states that this characterization breached any applicable standard of care.

Next, the plaintiff argues that Walker "continually evaluated the case based on one favorable witness that originally changed her story." (Doc. 122 at 33).[56] First, the plaintiff cites no evidence in support of this claim, or which explains what he means when he says that Walker "continually evaluated" the claim–*i.e.* was that the only factor she considered, how often did she reevaluate, etc. Second, even if the plaintiff had been

---

> favor, the one witness that was in her favor had changed her story, and that Murphree had stated she saw Cameron's vehicle at the intersection way before she got there. Cameron's attorneys provided numerous opportunities to settle within policy limits and Walker minimized the seriousness of the demands by characterizing them as "blowing smoke."

(Doc. 122 at 32). The only <u>conduct</u> of Walker described in this paragraph is the characterization in the letter that Cameron's attorneys were just "blowing smoke." The same letter was sent to Murphree as well.

[55] "[A]n exception to the general requirement that a plaintiff present expert testimony in support of a legal-malpractice claim occurs where a legal-service provider's want of skill or lack of care is so apparent as to be understood by a layperson and requires only common knowledge and experience to understand it." *Wachovia Bank, N.A.*, 42 So. 3d at 681. Leo does not alleges that this exception applies.

[56] Although Leo does not specifically so state, the court gives him the benefit of the doubt in construing this statement to mean "continually evaluated <u>in her discussions with Alfa</u>."

more specific, he cites no expert opinion explaining how this vaguely described conduct amounts to a breach of some standard of care. Regardless, the evidence is overwhelming that Walker evaluated the merits of the case on several occasions, based on a number of factors. She even, at times, described the case as "dangerous," and stated that Murphree might lose.

The plaintiff cites Burgess's opinion that Murphree's "desire to vindicate herself" was "[a]bsolutely not" a reasonable justification for Walker not to advise Alfa to settle. (Doc. 122 at 33). The plaintiff also cites Burgess's opinion that "Ms. Walker had all of the information, all of the discovery and all of the evidence and then some to tell her or for her to assimilate and go to Ashley [Murphree] and go to Alfa and get this case settled. She had plenty. She had more than enough, and she didn't do it." (Doc. 122 at 34) (quoting doc. 114-1 at 22(85)). This evidence relates to the failure by Walker to recommend to Alfa, directly, that it settle the case. As noted above, Burgess testified that "Alfa didn't need Walker to tell them [to settle the case], but she should have been telling them." (Doc. 122 at 36 (quoting 114-1 at 22(86)) (emphasis added)). Based upon Burgess's opinion that there was such a duty, with respect to Walker's communications with Alfa, summary judgment will be denied as to this claim contained in Count Six.

In the absence of any other evidence of how Walker breached a standard of care in her dealings with Alfa, summary judgment will be granted to the extent that Count Six

is based on the fact that Walker allegedly

> (c) Failed to fairly and objectively evaluate the case against MURPHREE [in her interactions with ALFA].

> * * *

> (f) Failed to provide ALFA with a thoroughly realistic, objective and honest assessment of the Cameron's claims against MURPHREE.

> * * *

> (s) Failed to reassess her own recommendations regarding settlement both before and after trial.

(Doc. 96 at 46-49) (capitalization in original) (original bold omitted).[57] Summary judgment will be denied to the extent that it is based on the fact that Walker allegedly "[f]ailed to recommend to ALFA that ALFA pay its policy limits or at least make some effort to settle the case against its insured MURPHREE."   (Doc. 96 at 46-49) (capitalization in original) (original bold omitted).

> **e.    Whether Walker Adequately Advised and Informed Murphree of the Risks of Trial, Including the Risks of a Judgment in Excess of her Policy Limits and the Fact of the Policy Limits Settlement Demand, and her Rights including Seeking Advice and Counsel from another Attorney**

Walker contends that the evidence shows that she adequately advised and informed

---

[57]  Because the court's holding is based on the plaintiff's failure to provide evidence in support of these claims, the court will not address Walker's <u>affirmative</u> evidentiary showing that the evidence demonstrates that summary judgment is due to be granted.  (Doc. 107 at 31-34).

Murphree of: 1) the risks of trial, including the risks of a judgment in excess of her policy limits; 2) the fact of the policy limits settlement demand; and 3) her rights including seeking advice and counsel from another attorney. Again, Walker is not specific as to which bases contained in Count Six she attacks. However, the court deems this argument to put the plaintiff on notice that he needed to produce evidence in support of his claims that Walker breached the standard of care when she allegedly:

(c) Failed to fairly and objectively evaluate the case against MURPHREE [in her dealings with MURPHREE][;]

* * *

(g) Failed to provide MURPHREE with a thoroughly realistic, objective and honest assessment of the [sic] Cameron's claims against MURPHREE[;]

(h) Failed to properly and adequately advise MURPHREE of the need (not just the right) to seek personal counsel;

(i) Failed to properly advise and counsel MURPHREE concerning the facts and law of the *Cameron v. Murphree* case[;]

(j) Failed to properly advise and counsel MURPHREE regarding the likelihood of successfully defending the *Cameron v. Murphree* case[;]

(k) Failed to properly advise and counsel MURPHREE regarding her potential monetary exposure in the *Cameron v. Murphree* case[;]

(l) Failed to properly advise and counsel MURPHREE regarding the risks and benefits to MURPHREE of ALFA either settling case or proceeding to trial[;]

(m) Failed to properly and clearly advise MURPHREE of WALKER

and ALFA's conflicts of interest with MURPHREE both once a policy limits demand was made, and once the excess verdict was rendered[;]

>   (n) Failed to accurately and timely apprise MURPHREE of ALFA's refusal to tender or offer the applicable policy limits in the underlying action; [and]

>   (o) Failed to properly and timely advise MURPHREE of the repeated and constant policy limit demands being made by Willow Joe Cameron's lawyers and their willingness to fully and finally release MURPHREE in exchange for a payment of ALFA's policy limits[.]

(Doc. 96 at 46-49) (capitalization and italics in original) (original bold omitted).

The plaintiff's response to these arguments is spread out through several different parts of his response brief.   The court will attempt to locate, and address, each contention in turn.

To the extent that these contentions are based on the March 30, 2012, "blowing smoke" letter, a copy of which was sent to Alfa <u>and</u> Murphree, again, the plaintiff provides no expert opinion which states that this characterization breached any applicable standard of care.

The plaintiff also notes that Burgess opines, in his expert report, that Walker:

>   let Murphree make the completely uninformed and/or misinformed decision to acquiesce in proceeding to trial where Murphree had nothing to gain and everything to lose; [and] let a nineteen- or twenty-year-old tell her and tell Alfa, "oh, I want my day in court" and that is "way below the standard of care."

(Doc. 122 at 32) (quoting 114-1 at 43).   Burgess cites no facts in the quoted material

supporting his opinion that Murphree was "completely uninformed and/or misinformed." Accordingly, this opinion is unhelpful to the trier of fact in determining whether that was a breach of any applicable standard of care.   Regardless, the overwhelming and uncontradicted evidence demonstrates that Murphree was regularly informed, in writing and in person, by Walker regarding the settlement demands, the limits of her coverage, the risks of proceeding to trial, and the merits of the underlying case.

> The plaintiff also cites Burgess's testimony that

> Ms. Walker should have gotten Ashley [Murphree] in and she should have sat her down – and here is the way it works, and people who do this know how it works. You say we have a chance to settle this case. Now, we have to tell -- me and you, Ashley, we have to tell Alfa to get their hundred thousand dollars out there, that's what we have got to do, we could lose this case. Honey, you could get out there and have a judgment against you for a huge amount for the rest of your life or either you have to go to bankruptcy. That's what you are facing. No, all of this, I'm not throwing you under the bus, me and you together are going to go to Alfa, we are going to say settle this case right now before we take a chance of getting that offer off the table.

(Doc. 122 at 33) (quoting doc. 114-1 at 20(79-80)).   First, in the portion of the deposition quoted, Burgess cites to no evidence from which he draws the conclusion that such a meeting did not occur.   For that reason, the opinion is not helpful to the trier of fact.   Further, the evidence in this case is overwhelming, and uncontradicted, that such a meeting did occur, several times.

> The plaintiff cites the unsworn statement Murphree gave to Alfa after the accident,

where she stated that she saw Cameron "way before" the collision, and that she had "started to slow down," when she saw Cameron.  (Doc. 122 at 33) (citing 103-2 at 55, 17).   The plaintiff argues that "instead of properly advising Murphree regarding the law [concerning subsequent negligence], Walker let Murphree make the uninformed decision to go to trial."  (Doc. 122 at 33).  The plaintiff cites no evidence in support of his claim that Murphree was "uninformed."  Further, he cites no expert testimony which specifically states that a failure to discuss this theory would be a breach of the standard of care. Regardless, the evidence is, again, overwhelming and uncontradicted, that Walker explained the law to Murphree several times, and advised her as to the risks of the case and discussed applicable legal theories, such as "subsequent negligence," prior to trial.

The plaintiff also argues that "Walker never properly advised Murphree of the repeated demands by Cameron's attorneys to settle for policy limits."  (Doc. 122 at 34). He cites no evidence in support of this claim.   Regardless, when asked in her deposition if she "ever actually [gave] Ms. Murphree any of Mr. Mann or Mr. Potter's actual demand letters," Walker testified: "I think I probably showed them to her whenever we met." (Doc. 109-1 at 37(146)).   Further, Walker herself advised Murphree by letter, and in person, that there had been settlement demands. There is no evidence to the contrary.[58.]

---

[58]  The plaintiff argues that Walker never "properly" advised Murphree of the demands. (Doc. 122 at 34).  He stated that "Walker never explained to Murphree the seriousness of such demands such that Murphree could make an informed decision."  (Doc. 122 at 34).  He also cites Burgess's opinion that Walker had a duty

[59] Because there is a lack of evidence supporting these bases for Count Six, summary judgment will granted to the extent that Count Six alleges that Walker:

> (c)  Failed to fairly and objectively evaluate the case against MURPHREE [in her dealings with MURPHREE][;]

> * * *

> (g)  Failed to provide MURPHREE with a thoroughly realistic, objective and honest assessment of the [sic] Cameron's claims against MURPHREE[;]

> (h)  Failed to properly and adequately advise MURPHREE of the need (not just the right) to seek personal counsel;

> (i)  Failed to properly advise and counsel MURPHREE concerning the facts and law of the *Cameron v. Murphree* case[;]

> (j)  Failed to properly advise and counsel MURPHREE regarding the likelihood of successfully defending the *Cameron v. Murphree* case[;]

> (k)  Failed to properly advise and counsel MURPHREE regarding her potential monetary exposure in the *Cameron v. Murphree* case[;]

---

> first . . . to make sure she [was] fully and totally informed that, number one, there is an opportunity and has been several to settle within the limits; and, number two, the true consequences, and I'm not talking about necessarily getting deep into what bankruptcy is all about, but the true consequences of what she may face if the case were not settled.

(Doc. 122 at 34-35) (quoting doc. 114-1 at 20(78)).  Again, the cited deposition testimony contains no facts upon which this conclusion is based.  Further, the evidence is overwhelming that Walker thoroughly discussed these issues with Murphree.

[59]  Because the court holds that the plaintiff has failed to present any evidence supporting these claims, it will not address Walker's affirmative defense argument that all of the evidence demonstrates that summary judgment is appropriate on these claims.  (Doc. 107 at 34-38).

(l) Failed to properly advise and counsel MURPHREE regarding the risks and benefits to MURPHREE of ALFA either settling case or proceeding to trial[;]

(m) Failed to properly and clearly advise MURPHREE of WALKER and ALFA's conflicts of interest with MURPHREE both once a policy limits demand was made, and once the excess verdict was rendered[;]

(n) Failed to accurately and timely apprise MURPHREE of ALFA's refusal to tender or offer the applicable policy limits in the underlying action; [and]

(o) Failed to properly and timely advise MURPHREE of the repeated and constant policy limit demands being made by Willow Joe Cameron's lawyers and their willingness to fully and finally release MURPHREE in exchange for a payment of ALFA's policy limits[.]

(Doc. 96 at 46-49).

### f.    The Truthfulness of Walker's Representations to Murphree

Walker argues that there is no evidence that she "ever conspired to deceive, suppress material facts, and/or defraud Murphree." (Doc. 107 at 41; *see also* doc. 107 at 41-42). Further, Walker argues that "the extensive correspondence and testimony . . . shows by overwhelming evidence that everything Walker . . . did was in Murphree's best interest." (Doc. 107 at 41). These generalized arguments, which could fairly be applied to any of the bases for Count Six, are not expanded upon in any real way. Accordingly, the court will not consider this underdeveloped argument.

### g.      Damages

As noted above, there is no admissible evidence of mental and emotional distress damages.  Those claims, as against Walker, will be dismissed.  Also as noted above in its discussion of the damages *vis a vis* Alfa, any credits as against the total amount of a judgment to be awarded, if any, can be taken into account by the trier of fact.

## V.      CONCLUSION

For the reasons stated herein, it is hereby **ORDERED, ADJUDGED**, and **DECREED** as follows:

1.      Alfa and Walker's Motions to Strike portions of the affidavit of Michelle Burgess (docs. 125 and 131) are **GRANTED in part** and **DENIED in part** as noted.

2.      Alfa's Motion to Strike the testimony of Ivey Gilmore (doc. 128) is **GRANTED in part** and **DENIED in part** as noted.

3.      Alfa's Motion to Strike the plaintiff's non-compliant portions of his response to Alfa's Motion for Summary Judgment (doc. 129) is **DENIED**.

4.      Alfa and Walker's Motions for Summary Judgment (doc. 103 and 105) are **GRANTED in part** and **DENIED in part**.  More specifically, Summary Judgment is **GRANTED** in favor of the defendants and against the plaintiff as to:

A.      Counts Two and Three, only to the extent that they are based on Alfa's alleged negligent failure to investigate;

B.      Count Four in its entirety;

C.      Count Six, to the extent that that claim is based on:

     i.      The allegation in paragraph 159(i) of Count Six of the Second Amended Complaint which states that Walker "[d]rafted and procured execution of the COVENANT NOT TO SUE contract/release that was to the detriment of her client, MURPHREE, and to the benefit of WALKER and ALFA." (Doc. 96 at 51);

     ii.      Any allegation of malpractice in preparation for, and manner of trial of, the Underlying Action;

     iii.      The allegation in paragraph 158(e) of the Second Amended Complaint, which states that Walker "[f]ailed to recommend to MURPHREE that MURPHREE request that ALFA settle the case." (Doc. 96 at 46);

     iv.      The allegation in paragraph 158(c) of the Second Amended Complaint, which states that Walker "failed to fairly and objectively evaluate the case against MURPHREE [in her interactions with ALFA]. (Doc. 96 at 47);

     v.      The allegation in paragraph 158(f) of the Second Amended

115

Complaint, which states that Walker "failed to provide ALFA with a thoroughly realistic, objective and honest assessment of the Cameron's claims against MURPHREE." (Doc. 96 at 47);

vi.     The allegation in paragraph 158(s) of the Second Amended Complaint, which states that Walker "failed to reassess her own recommendations [to Alfa] regarding settlement both before and after trial. (Doc. 96 at 46-49);

vii.    The allegation in paragraph 158(c) of the Second Amended Complaint, which states that Walker "failed to fairly and objectively evaluate the case against MURPHREE [in her dealings with MURPHREE]." (Doc. 96 at 47);

viii.   The allegation in paragraph 158(g) of the Second Amended Complaint, which states that Walker "[f]ailed to provide MURPHREE with a thoroughly realistic, objective and honest assessment of the [sic] Cameron's claims against MURPHREE." (Doc. 96 at 47);

ix.     The allegation in paragraph 158(h) of the Second Amended Complaint, which states that Walker "f]ailed to properly and adequately advise MURPHREE of the need (not just the right) to

116

seek personal counsel." (Doc. 96 at 47);

x.     The allegation in paragraph 158(i) of the Second Amended Complaint, which states that Walker "[f]ailed to properly advise and counsel MURPHREE concerning the facts and law of the *Cameron v. Murphree* case." (Doc. 96 at 47);

xi.    The allegation in paragraph 158(j) of the Second Amended Complaint, which states that Walker "[f]ailed to properly advise and counsel MURPHREE regarding the likelihood of successfully defending the *Cameron v. Murphree* case." (Doc. 96 at 47);

xii.   The allegation in paragraph 158(k) of the Second Amended Complaint, which states that Walker "[f]ailed to properly advise and counsel MURPHREE regarding her potential monetary exposure in the *Cameron v. Murphree* case." (Doc. 96 at 48);

xiii.  The allegation in paragraph 158(l) of the Second Amended Complaint, which states that Walker "[f]ailed to properly advise and counsel MURPHREE regarding the risks and benefits to MURPHREE of ALFA either settling case or proceeding to trial." (Doc. 96 at 48).

xiv.   The allegation in paragraph 158(m) of the Second Amended

Complaint, which states that Walker "[f]ailed to properly and clearly advise MURPHREE of WALKER and ALFA's conflicts of interest with MURPHREE both once a policy limits demand was made, and once the excess verdict was rendered." (Doc. 96 at 48);

xv.    The allegation in paragraph 158(n) of the Second Amended Complaint, which states that Walker "[f]ailed to accurately and timely apprise MURPHREE of ALFA's refusal to tender or offer the applicable policy limits in the underlying action."  (Doc. 96 at 48);

xvi.   The allegation in paragraph 158(o) of the Second Amended Complaint, which states that Walker "[f]ailed to properly and timely advise MURPHREE of the repeated and constant policy limit demands being made by Willow Joe Cameron's lawyers and their willingness to fully and finally release MURPHREE in exchange for a payment of ALFA's policy limits." (Doc. 96 at 48).

D.    All claims for mental anguish damages and claims for attorneys' fees.

In all other respects, Summary Judgment is **DENIED**.

**DONE** and **ORDERED** this 28th day of March, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

118